FILED

2008 DEC 22 AM 10: 44

CLERK U.S. DISTRICT COURT
CENTRAL DIST. F CALIF.
LOS ANGELES

BY _____

1   John D. Klinedinst, Bar No. 86254
    Gregor A. Hensrude, Bar No. 226660
2   KLINEDINST PC
    777 S. Figueroa Street, 47th Floor
3   Los Angeles, California 90017
    (213) 607-2115/FAX (213) 607-2116
4   ghensrude@klinedinstlaw.com

5   Edward E. Casto, Jr. Esq.
    Brent N. Bumgardner, Esq.
6   Barry J. Bumgardner, Esq.
    Steven W. Hartsell, Esq.
7   NELSON BUMGARDNER CASTO, P.C.
    5601 Bridge Street, Suite 300
8   Fort Worth, Texas 76112
    817-377-9111/FAX 817-377-3485
9
    Attorneys for Plaintiff
10  GUARDIAN MEDIA TECHNOLOGIES,
    LTD
11

KLINEDINST PC
501 WEST BROADWAY, STE. 600
SAN DIEGO, CALIFORNIA 92101

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

Case No. CV08-08439 SJO VBKx

| | |
|---|---|
| GUARDIAN MEDIA TECHNOLOGIES, LTD, | **COMPLAINT** |
| Plaintiff, | Date |
| | Time: |
| v. | Courtroom: |
| | Judge: |
| COBY ELECTRONICS CORPORATION; ACER AMERICA CORPORATION; AMAZON.COM, INC.; APPLE INC.; BANG & OLUFSEN AMERICA, INC.; BEST BUY CO., INC.; BOSE CORP.; CISCO SYSTEMS, INC.; COSTCO WHOLESALE CORP.; DELL INC.; DIRECTV, INC.; DIRECTV HOLDINGS, L.L.C.; ECHOSTAR CORPORATION; ECHOSTAR TECHNOLOGIES, L.L.C.; FUJITSU GENERAL AMERICA, INC.; IMATION CORP.; LENOVO (UNITED STATES) INC.; LITE-ON AMERICAS, INC.; LITE-ON SALES & DISTRIBUTION, INC.; MEMOREX PRODUCTS, INC.; MICROSOFT CORPORATION; MOTOROLA, INC.; NINTENDO OF AMERICA, INC.; ONKYO USA CORP.; OVERSTOCK.COM, INC.; RADIO SHACK CORP; ROBERT | Magistrate Judge: |
| | Complaint Filed: |
| | Trial Date:   None set |

BOSCH, L.L.C.; SCIENTIFIC-
ATLANTA, INC.; SEARS,
ROEBUCK AND CO.; SHERWOOD
AMERICA, INC.; SOUND AROUND,
INC.; TARGET CORP.; TIVO, INC.;
TTE TECHNOLOGY, INC.; WAL-
MART STORES, INC.; VIEWSONIC
CORPORATION; YAMAHA
CORPORATION OF AMERICA;
AND YAMAHA ELECTRONICS
CORPORATION

Defendants.

Plaintiff Guardian Media Technologies, Ltd. files this Original Complaint against the above-named Defendants, alleging as follows:

## I.

## **THE PARTIES**

1.    Plaintiff Guardian Media Technologies, Ltd. ("Guardian") is a Texas Limited Partnership.  Guardian has a mailing address at 3801 N. Capital of Texas Highway, E240-303, Austin, Texas 78746.

2.    Defendant Coby Electronics Corporation ("Coby") is a corporation organized and existing under the laws of the State of New York with its principal place of business located at 1991 Marcus Ave., Lake Success, New York 11042.  Coby can be served via its registered agent for service of process, Rick Herrera, 3030 E. Victoria Street, Rancho Dominguez, California 90221.

3.    Defendant Acer America Corporation ("Acer") is a corporation organized and existing under the laws of the State of California with its principal place of business located at 333 West San Carlos Street, Suite 1500, San Jose, California 95110.  Acer can be served via its registered agent for service of process, CT Corporation System, 818 West 7th Street, Los Angeles, California 90017.

4.    Defendant Amazon.com, Inc. ("Amazon") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 1200 12th Ave. South, Suite 1200, Seattle, Washington 98144.  Amazon can be

KLINEDINST PC
501 WEST BROADWAY, STE. 600
SAN DIEGO, CALIFORNIA 92101

- 1 -

1    served via its registered agent for service of process, Corporation Service Company, 2711

2    Centerville Road., Suite 400, Wilmington, Delaware 19808.

3        5.    Defendant Apple Inc. ("Apple") is a corporation organized and existing

4    under the laws of the State of California with its principal place of business located at 1

5    Infinite Loop, Cupertino, California 95014. Apple can be served via its registered agent

6    for service of process, CT Corporation System, 818 West 7th Street, Los Angeles,

7    California 90017.

8        6.    Defendant Bang & Olufsen America, Inc. ("Bang & Olufsen") is a

9    corporation organized and existing under the laws of the State of Delaware with its

10   principal place of business located at 780 West Dundee Road, Arlington Heights, Illinois

11   6004. Bang & Olufsen can be served via its registered agent for service of process, The

12   Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington,

13   Delaware 19801.

14       7.    Defendant Best Buy Co., Inc. ("Best Buy") is a corporation organized and

15   existing under the laws of the State of Minnesota with its principal place of business

16   located at 7601 Penn Ave. South, Richfield, Minnesota 55423. Best Buy may be served

17   via its registered agent for service of process, CT Corporation System, 818 West 7th

18   Street, Los Angeles, California 90017.

19       8.    Defendant Bose Corporation ("Bose") is a corporation organized and

20   existing under the laws of the State of Delaware with its principal place of business

21   located at The Mountain, Framingham, Massachusetts 01701. Bose can be served via its

22   registered agent for service of process, CT Corporation System, 818 West 7th Street, Los

23   Angeles, California 90017.

24       9.    Defendant Cisco Systems, Inc. ("Cisco") is a corporation organized and

25   existing under the laws of the State of California with its principal place of business

26   located at 170 West Tasman Drive, San Jose, California 95134. Cisco can be served via

27   its registered agent for service of process, Corporation Service Company, 2730 Gateway

28   Oaks Drive, Suite 100, Sacramento, California 95833.

KLINEDINST PC
501 WEST BROADWAY, STE. 600
SAN DIEGO, CALIFORNIA 92101

**COMPLAINT**

10. Defendant Costco Wholesale Corp. ("Costco") is a corporation organized and existing under the laws of the State of Washington with its principal place of business at 999 Lake Drive, Issaquah, Washington 98027. Costco can be served via its registered agent for service of process, CT Corporation System, 818 West 7th Street, Los Angeles, California 90017.

11. Defendant Dell Inc. ("Dell") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at One Dell Way, Round Rock, Texas 78682. Dell can be served via its registered agent for service of process, Corporation Service Company, 701 Brazos Street, Suite 1050, Austin, Texas 78701.

12. Defendant DirecTV, Inc. ("DirecTV") is a corporation organized and existing under the laws of the State of California with its principal place of business located at 2250 East Imperial Hwy., El Segundo, California 90245. DirecTV can be served via its registered agent for service of process, Corporation Service Company, 2730 Gateway Oaks Drive, Suite 100, Sacramento, California 95833.

13. Defendant DirecTV Holdings, L.L.C. ("DirecTV Holdings") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business located at 2250 East Imperial Hwy., El Segundo, California 90245. DirecTV Holdings can be served via its registered agent for service of process, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

14. Defendant EchoStar Corporation ("EchoStar") is a corporation organized and existing under the laws of the State of Nevada with its principal place of business located at 90 Inverness Circle East, Englewood, Colorado, 80112. EchoStar can be served via its registered agent for service of process, CSC Services of Nevada, Inc., 502 East John Street, Carson City, Nevada 89706.

15. Defendant EchoStar Technologies, L.L.C. ("EchoStar Technologies") is a limited liability company organized and existing under the laws of the State of Texas

COMPLAINT

1    with its principal place of business located at 90 Inverness Circle East, Englewood,

2    Colorado, 80112. EchoStar Technologies can be served via its registered agent for

3    service of process, Corporation Service Company, 701 Brazos Street, Suite 1050, Austin,

4    Texas 78701.

5        16.    Defendant Fujitsu General America, Inc. ("Fujitsu") is a corporation

6    organized and existing under the laws of the State of Delaware with its principal place of

7    business located at 353 Route 46 W, Fairfield, New Jersey 07004. Fujitsu can be served

8    via its registered agent for service of process, Corporation Service Company, 2730

9    Gateway Oaks Drive, Suite 100, Sacramento, California 95833.

10        17.    Defendant Imation Corp. ("Imation") is a corporation organized and

11   existing under the laws of the State of Delaware with its principal place of business

12   located at 1 Imation Way, Oakdale, Minnesota 55128. Imation can be served via its

13   registered agent for service of process, CT Corporation System, 818 West 7th Street, Los

14   Angeles, California 90017.

15        18.    Defendant Lenovo (United States) Inc. ("Lenovo") is a corporation

16   organized and existing under the laws of the State of Delaware with its principal place of

17   business located at 1009 Think Place, Morrisville, North Carolina 27560. Lenovo can be

18   served via its registered agent for service of process, CT Corporation System, 818 West

19   7th Street, Los Angeles, California 90017.

20        19.    Defendant Lite-On Americas, Inc. ("Lite-On") is a corporation organized

21   and existing under the laws of the State of Delaware with its principal place of business

22   located at 42000 Christy Street, Fremont, California 94538. Lite-On can be served via its

23   registered agent for service of process, Michael Law, 42000 Christy Street, Fremont,

24   California 94538.

25        20.    Defendant Lite-On Sales & Distribution, Inc. ("Lite-On Sales") is a

26   corporation organized and existing under the laws of the State of Delaware with its

27   principal place of business located at 42000 Christy Street, Fremont, California 94538.

28   Lite-On Sales can be served via its registered agent for service of process, The

KLINEDINST PC
501 WEST BROADWAY, STE. 600
SAN DIEGO, CALIFORNIA 92101

- 4 -

KLINEDINST PC
501 WEST BROADWAY, STE. 600
SAN DIEGO, CALIFORNIA 92101

1    Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington,

2    Delaware 19801.

3        21.    Defendant Memorex Products, Inc. ("Memorex") is a corporation organized

4    and existing under the laws of the State of California with its principal place of business

5    located at 17777 Center Court Dr., Suite 800, Cerritos, California 90703. Memorex can

6    be served via its registered agent for service of process, CT Corporation System, 818

7    West 7th Street, Los Angeles, California 90017. Upon information and belief, Memorex

8    is a portfolio brand of Defendant Imation Corp.

9        22.    Defendant Microsoft Corporation ("Microsoft") is a corporation organized

10    and existing under the laws of the State of Washington with its principal place of

11    business located at One Microsoft Way, Redmond, Washington 98052. Microsoft can be

12    served via its registered agent for service of process, Corporation Service Company, 2730

13    Gateway Oaks Drive, Suite 100, Sacramento, California 95833.

14        23.    Defendant Motorola, Inc. ("Motorola") is a corporation organized and

15    existing under the laws of the State of Delaware with its principal place of business

16    located at 1303 E. Algonquin Road, Schaumburg, Illinois. Motorola can be served via its

17    registered agent for service of process, CT Corporation System, 818 West 7th Street, Los

18    Angeles, California 90017.

19        24.    Defendant Nintendo of America, Inc. ("Nintendo") is a corporation

20    organized and existing under the laws of the State of Washington with its principal place

21    of business located at 4820 150th Avenue N.E., Redmond, Washington, 98052. Nintendo

22    can be served via its registered agent for service of process, CT Corporation System, 818

23    West 7th Street, Los Angeles, California 90017.

24        25.    Defendant Onkyo USA Corporation ("Onkyo") is a corporation organized

25    and existing under the laws of the State of Illinois with its principal place of business

26    located at 18 Park Way, Upper Saddle River, NJ 07458. Onkyo can be served with

27    process via it agent for service of process, Corporation Service Company, 2730 Gateway

28    Oaks Drive, Suite 100, Sacramento, California 95833.

**COMPLAINT**

26. Defendant Overstock.com, Inc. ("Overstock") is a corporation organized and existing under the law of the State of Delaware with its principal place of business at 6350 South 3000 East, Salt Lake City, Utah 84121. Overstock can be served via its registered agent for service of process, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

27. Defendant Radio Shack Corporation ("Radio Shack") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 300 Radio Shack Circle, Fort Worth, Texas 76102. Radio Shack can be served via its registered agent for service of process, Corporation Service Company, 701 Brazos Street, Suite 1050, Austin, Texas 78701.

28. Defendant Robert Bosch, L.L.C. ("Bosch") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business located at 2800 S. 25th Ave., Broadview, Illinois 60153. Bosch can be served via its registered agent for service of process, Corporation Service Company, 2711 Centerville Road., Suite 400, Wilmington, Delaware 19808.

29. Defendant Scientific-Atlanta, Inc. ("Scientific-Atlanta") is a corporation organized and existing under the laws of the State of Georgia with its principal place of business located at 5030 Sugarloaf Parkway, Lawrenceville, Georgia 30044. Scientific-Atlanta can be served via its registered agent for service of process, CT Corporation System, 818 West 7th Street, Los Angeles, California 90017.

30. Defendant Sears, Roebuck and Co. ("Sears") is a corporation organized and existing under the laws of the State of New York with its principal place of business at 3333 Beverly Road, Hoffman Estates, Illinois 60179. Sears can be served via its registered agent for service of process, CT Corporation System, 818 West 7th Street, Los Angeles, California 90017.

31. Defendant Sherwood America, Inc. ("Sherwood") is a corporation organized and existing under the laws of the State of California with its principal place of business located at 13101 Moore Street, Cerritos, California 90703. Sherwood can be

KLINEDINST PC
501 WEST BROADWAY, STE. 600
SAN DIEGO, CALIFORNIA 92101

**COMPLAINT**

1    served via its registered agent for service of process, Troy S, 3200 Wilshire Blvd., #1208-

2    North Tower, Los Angeles, California 90010.

3        32.    Defendant Sound Around, Inc. ("Sound Around") is a corporation

4    organized and existing under the laws of the State of New York with its principal place of

5    business located at 1600 63rd Street, Brooklyn, New York 11204. Sound Around can be

6    served via its Chairman/CEO Zigmond Brach at Sound Around's principal place of

7    business. Upon information and belief, Sound Around sells DVD players under the Pyle

8    Audio brand.

9        33.    Defendant Target Corporation ("Target") is a corporation organized and

10    existing under the laws of the State of Minnesota with its principal place of business

11    located at 1000 Nicollet Mall, Minneapolis, Minnesota. Target can be served via its

12    registered agent for service of process, CT Corporation System, 818 West 7th Street, Los

13    Angeles, California 90017.

14        34.    Defendant Tivo Inc. ("Tivo") is a corporation organized and existing under

15    the laws of the State of Delaware with its principal place of business located at 2160 Gold

16    Street, Alviso, California 95002. Tivo can be served via its registered agent for service of

17    process, Corporation Service Company, 2730 Gateway Oaks Drive, Suite 100,

18    Sacramento, California 95833.

19        35.    Defendant TTE Technology, Inc. ("TTE") is a corporation organized and

20    existing under the laws of the State of Delaware with its principal place of business

21    located at 101 W 103rd Street, INH-620 Indianapolis, Indiana 46290. TTE can be served

22    via its registered agent for service of process, Corporation Service Company, 2730

23    Gateway Oaks Drive, Suite 100, Sacramento, California 95833.

24        36.    Defendant ViewSonic Corporation ("ViewSonic") is a corporation

25    organized and existing under the laws of the State of Delaware with its principal place of

26    business located at 381 Brea Canyon Road, Walnut, California 91789. ViewSonic can be

27    served via its registered agent for service of process, Theodore R. Sanders, 381 Brea

28    Canyon Road, Walnut, California 91789.

KLINEDINST PC
501 WEST BROADWAY, STE. 600
SAN DIEGO, CALIFORNIA 92101

- 7 -

KLINEDINST PC
501 WEST BROADWAY, STE. 600
SAN DIEGO, CALIFORNIA 92101

37.     Defendant Wal-Mart Stores, Inc. ("Wal-Mart") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 702 S.W. 8th Street, Bentonville, Arkansas 72716.  Wal-Mart can be served via its registered agent for service of process, CT Corporation System, 818 West 7th Street, Los Angeles, California 90017.

38.     Defendant Yamaha Corporation of America ("Yamaha America") is a corporation organized and existing under the laws of the State of California with its principal place of business located at 6000 Orangethrope Ave., Buena Park, California 90620.  Yamaha America can be served via its registered agent for service of process, CSC-Lawyers Incorporating Service, 2730 Gateway Oaks, Drive, Suite 100, Sacramento, California 95833.

39.     Defendant Yamaha Electronics Corporation ("Yamaha Electronics") is a corporation organized and existing under the laws of the State of California with its principal place of business located at 6000 Orangethrope Ave., Buena Park, California 90620.  Yamaha Electronics can be served via its registered agent for service of process, CSC-Lawyers Incorporating Service, 2730 Gateway Oaks, Drive, Suite 100, Sacramento, California 95833.  Upon information and belief, Yamaha Electronics is a wholly owned subsidiary of Defendant Yamaha America.

## II.

## JURISDICTION AND VENUE

40.     This is an action for infringement of a United States patent arising under 35 U.S.C. §§ 271, 281, and 284-285, among others.  This Court has subject matter jurisdiction of the action under Title 28 U.S.C. §1331 and §1338(a).

41.     The Court has personal jurisdiction over each Defendant, and venue is proper pursuant to 28 U.S.C. §§ 1391 and 1400(b).

42.     Each Defendant has substantial contacts with the forum as a result of pervasive business activities conducted within the State of California and within this District, including but not limited to the manufacture, sale, and/or distribution of DVD

- 8 -

1  players, televisions, and/or computers capable of playing DVDs and/or receiving

2  television and/or video programs.

3      43.    Each Defendant has committed acts of patent infringement, directly and/or

4  through agents and intermediaries, by shipping, distributing, importing, offering for sale,

5  and/or selling certain infringing products in California and, particularly, the Central

6  District of California.

7      44.    Each Defendant has purposefully and voluntarily placed one or more of its

8  infringing products into the stream of commerce with the expectation that they will be

9  purchased by consumers in the Central District, who in turn use the products in an

10  infringing manner in this District.

### III.

### PATENT INFRINGEMENT

11

12

13      45.    On May 29, 1990, United States Patent No. 4,930,158 (the "'158 patent")

14  was issued for "Selective Video Playing System." A true and correct copy of the '158

15  patent is attached hereto as Exhibit "A" and made a part hereof. On November 4, 2008,

16  the United States Patent and Trademark Office issued a reexamination certificate for the

17  '158 patent. A true and correct copy of this reexamination certificate is attached hereto

18  as Exhibit "B" and is made a part hereof.

19      46.    On May 29, 1990, United States Patent No. 4,930,160 (the "'160 patent")

20  was issued for "Automatic Censorship of Video Programs." A true and correct copy of

21  the '160 patent is attached hereto as Exhibit "C" and made a part hereof. On December

22  4, 2008, the United States Patent and Trademark Office mailed a Notice of Intent to Issue

23  Ex Parte Reexamination Certificate in connection with two consolidated reexamination

24  proceedings concerning the '160 patent. A true and correct copy of this notice is attached

25  hereto as Exhibit "D" and is made a part hereof.

26      47.    Guardian is the owner of the '158 and '160 patents (collectively, the

27  patents-in-suit) with all substantive rights in and to the patents-in-suit, including the sole

28

KLINEDINST PC
501 WEST BROADWAY, STE. 600
SAN DIEGO, CALIFORNIA 92101

1    and exclusive right to prosecute this action and enforce the patents-in-suit against

2    infringers, and to collect damages for all relevant times. The patents-in-suit are expired.

3         48.    As it pertains to this lawsuit, the '158 patent generally relates to parental

4    control features contained in DVD players offered for sale by Defendants that allow

5    owners of the players to restrict the types of DVDs viewed by others.

6         49.    As it pertains to this lawsuit, the '160 patent generally relates to parental

7    control features contained in televisions offered for sale by Defendants that allow owners

8    of televisions to restrict viewing of certain movies and other video content based on the

9    particular program's rating for all televisions and monitors over 13 inches. *See* 47 C.F.R.

10   15.120.

11        50.    Prior to the expiration of the patents-in-suit, Defendants Coby, Acer,

12   Amazon, Apple, Bang and Olufsen, Best Buy, Bose, Cisco, Costco, Dell, DirecTV,

13   DirecTV Holdings, EchoStar, EchoStar Technologies, Fujitsu, Imation, Lenovo, Lite-On,

14   Lite-On Sales, Memorex, Microsoft, Motorola, Nintendo, Onkyo, Overstock, Radio

15   Shack, Bosch, Scientific-Atlanta, Sears, Sherwood, Target, Tivo, Wal-Mart, Yamaha

16   America, and Yamaha Electronics directly or through intermediaries, made, had made,

17   used, imported, provided, supplied, distributed, sold, and/or offered for sale products

18   and/or systems that infringed or, when used, infringed one or more claims of the '158

19   patent. In addition, Defendants induced infringement and/or contributed to the

20   infringement of one or more of the claims of the '158 patent by others.

21        51.    Prior to the expiration of the patents-in-suit, Defendants Acer, Amazon,

22   Best Buy, Cisco, Coby, Costco, Dell, DirecTV, DirecTV Holdings, EchoStar, EchoStar

23   Technologies, Fujitsu, Lenovo, Motorola, Overstock, Radio Shack, Scientific-Atlanta,

24   Sears, Sound Around, Target, Tivo, TTE, Wal-Mart and ViewSonic directly or through

25   intermediaries, made, had made, used, imported, provided, supplied, distributed, sold,

26   and/or offered for sale products and/or systems that infringed or, when used, infringed

27   one or more claims of the '160 patent. In addition, Defendants induced infringement

28

KLINEDINST PC
501 WEST BROADWAY, STE. 600
SAN DIEGO, CALIFORNIA 92101

1  and/or contributed to the infringement of one or more of the claims of the '160 patent by

2  others.

3      52.    Guardian has been damaged as a result of Defendants' infringing conduct.

4  Defendants are, thus, liable to Guardian in an amount that adequately compensates it for

5  their infringements, which, by law, cannot be less than a reasonable royalty, together with

6  interest and costs as fixed by this Court under 35 U.S.C. § 284.

## III.

## JURY DEMAND

9      53.    Guardian hereby requests a trial by jury pursuant to Rule 38 of the Federal

10  Rules of Civil Procedure.

## IV.

## PRAYER FOR RELIEF

13      Guardian requests that the Court find in its favor and against Defendants, and that

14  the Court grant Guardian the following relief:

15      a.    Judgment that one or more claims of United States Patent No. 4,930,158

16  and/or 4,930,160 have been infringed, either literally and/or under the doctrine of

17  equivalents, by one or more Defendants and/or by others to whose infringement

18  Defendants have contributed and/or by others whose infringement has been induced by

19  Defendants;

20      b.    Judgment that Defendants account for and pay to Guardian all damages to

21  and costs incurred by Guardian because of Defendants' infringing activities and other

22  conduct complained of herein;

23      c.    That, to the extent Defendants have had knowledge of their infringing

24  activities, Defendants' infringements be found to be willful from the time that Defendants

25  became aware of the infringing nature of their respective activities, and that the Court

26  award treble damages for the period of such willful infringement pursuant to 35 U.S.C. §

27  284;

28

KLINEDINST PC
501 WEST BROADWAY, STE. 600
SAN DIEGO, CALIFORNIA 92101

COMPLAINT

d.    That Guardian be granted pre judgment and post-judgment interest on the damages caused by Defendants' infringing activities and other conduct complained of herein;

e.    That this Court declare this an exceptional case and award Guardian its reasonable attorney's fees and costs in accordance with 35 U.S.C. § 285; and

f.    That Guardian be granted such other and further relief as the Court may deem just and proper under the circumstances.

KLINEDINST PC

DATED: December 19, 2008        By: _____
                                     GREGOR A. HENSRUDE
                                     Attorneys for Plaintiff
                                     GUARDIAN MEDIA TECHNOLOGIES,
                                     LTD

711318v1

**COMPLAINT**

KLINEDINST PC
501 WEST BROADWAY, STE. 600
SAN DIEGO, CALIFORNIA 92101

# Exhibit "A"

# United States Patent [19]

## Vogel

[11] Patent Number: 4,930,158

[45] Date of Patent: May 29, 1990

[54] **SELECTIVE VIDEO PLAYING SYSTEM**

[76] Inventor: Peter S. Vogel, 28 Adeline St., Faulconbridge, NSW 2776, Australia

[21] Appl. No.: 237,175

[22] Filed: Aug. 29, 1988

[30] **Foreign Application Priority Data**

Sep. 2, 1987 [AU] Australia ................................. PI4107

[51] Int. Cl.$^5$ ............................................. H04N 7/16
[52] U.S. Cl. .......................................... 380/5; 380/20; 380/23; 358/349
[58] Field of Search ...................... 380/3, 5; 358/349; 340/825.31, 825.34

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,225,884 | 9/1980 | Block et al. | 380/20 |
| 4,528,588 | 7/1985 | Löfberg | 358/349 |
| 4,595,950 | 6/1986 | Löfberg | 380/5 |
| 4,670,857 | 6/1987 | Rackman | 380/5 X |

## OTHER PUBLICATIONS

Rae Atkey, "How You Can Censor Your Child's TV Viewing", The News Editorial (Adelaide) 8/25/1986.

*Primary Examiner*—Stephen C. Buczinski
*Assistant Examiner*—Bernarr Earl Gregory

[57]    **ABSTRACT**

A classification code, recorded repeatedly along with program material, is recovered on playing a video recording, and used to inhibit replay if the recovered code matches any of a set of codes specified by the user. The codes which cause replay to be inhibited can be set by the user after entering a personal identity number. The user can optionally request that a code be recorded when recording a program. Signals are optionally provided so that an auxiliary device, such as a second video player, can be controlled in response to codes recovered. One application is to prevent children viewing certain video recordings without parental permission.

22 Claims, 5 Drawing Sheets





Fig. 1

**U.S. Patent**    May 29, 1990    Sheet 2 of 5    **4,930,158**





Fig. 2



Fig. 3



OVERRIDE



Fig. 4

AUXILIARY CONTROL



Fig. 5

4,930,158

**1**

## SELECTIVE VIDEO PLAYING SYSTEM

### FIELD OF THE INVENTION

The present invention relates to methods of, and apparatus for, controlling the playing of video programs recorded on tape or other storage medium. The term video program also includes an accompanying audio signal if any.

### BACKGROUND OF THE INVENTION

With the ready availability of video tape recordings and domestic equipment upon which they can be played, there is a need to restrict access of certain groups of people to certain classes of program. For example it might be desired to prevent children viewing certain classes of material, for example pornographic or violent movies. Traditionally, such security needs have been addressed by physically preventing unauthorized persons from having access to restricted recordings. This method is becoming less practical as the availability of both videotapes and machines to play them increases. For example, parents who wish to have pornographic videotapes in the home, for adult viewing only, risks a child finding the tape and playing it in the parent' absence.

It is therefore desirable to provide means whereby display of preselected classifications of program material can be viewed only by authorized persons.

Arrangements for making video programs available to only authorised viewers have long been used in the context of subscription television services and the like. These schemes commonly use a form of scrambling to make the signal unintelligible except to authorized persons in possession of appropriate un-scrambling means. While it would be possible to apply similar techniques to video programs, for example scrambling pornographic movies, this would have the undesired consequence of rendering these tapes unusable to all persons who do not have special replay means. For many purposes, such as the domestic situation cited above, it is desirable that in the default condition, that is when using standard equipment, the tape plays normally. This means that a specially equipped tape player is only required if it is desired to take advantage of the restricted viewing capability.

Prior-art video security means have also been directed to providing control of viewer access by the party from whom the program originates. This is not always satisfactory, for example in the case of parental control of children's viewing, it is desirable that the parent, rather than the publisher or supplier of the video tape, be able to select whether a given tape will be viewable or not.

### SUMMARY OF THE INVENTION

The present invention is directed to providing novel and improved means and method of controlling the playing of video recordings whereby authorised persons can select which classifications of material can be viewed.

According to a first aspect of the present invention, there is provided a video recording playing method comprising the steps of replaying a video program, recovering from the replayed signal a classification code accompanying the recording, comparing the recovered classification signal to a set of user-selected classifications, and depending on the result of this com-

**2**

parison, causing the replay of the program to be suspended or terminated.

According to a second aspect of this inventive concept, apparatus for playing a video recording is provided, comprising video recording replay means, classification code detector means, a comparator equipped to compare the recovered classification code to a set of user-selected classifications, and a controller capable of causing suspension or termination of replay on detection at the output of the comparator a signal indicating equality between the recovered classification code and a set of user-selected classifications.

Some embodiments of this invention also include an arrangement for enabling access to selection of classifications which are to cause suspension or termination of replay only after entering a security code, or personal identification number (PIN), by the user.

In the case of commercially pre-recorded video tapes, the classification code is recorded before distribution to the consumer, for example by the publisher or duplicator of the recordings. In cases where it is desired to control viewing of material recorded privately, for example off-air or by camera, recording means for combining a classification code with the recorded program can be provided as well.

### BRIEF DESCRIPTION OF THE DRAWINGS

An embodiment of the present invention will now be described, by way of example only, with reference to the drawings in which:

FIG. 1 is a schematic block diagram of an embodiment of the invention which includes means for optionally recording classification and program;

FIG. 2 is a schematic diagram of the operational loop of the programme executed by the microcomputer of this embodiment;

FIG. 3 is a schematic diagram of the software used for selecting which classifications cause suspension or termination of playing;

FIG. 4 is a schematic diagram of the software used for overriding the suspension or termination function; and

FIG. 5 is a schematic block diagram of the software used for control of auxiliary devices.

### DETAILED DESCRIPTION

As seen in FIG. 1 this embodiment of the invention comprises the conventional components of a video recorder/player (commonly known as VCR), including record signal processor 2, replay signal processor 4, transport controller 9 and storage medium 3, which is typically a video cassette, but may also be a video disk or any other suitable storage medium.

The operation of this embodiment relies on the presence of a program classification code within the video signal. This can be provided in a number of well known ways which ensure that the presence of such codes do not interfere with the normal viewing of video programs. The method used in this embodiment is encoding of a digital word in the form of black and white transitions located on line 16 of the video signal. This position is chosen so as to be invisible on the CRT display. The technology for this form of signalling is well known, being commonly used for data broadcasting services such as Teletext.

For the purpose of recording a program and inserting a classification code for later use by the invention, clas-

4,930,158

3

sification code inserter 12 inserts a code, dictated by microcomputer 6, into line 16 of the video signal as it is recorded.

Classification detector 5 extracts line 16 from the replay signal, and presents the code found therein to an input of microcomputer 6.

Microcomputer 6 is self-contained "single chip computer" including RAM, ROM, IO ports, CPU and NV (non-volatile) memory. Microcomputer 6 may also perform many other functions required by the VCR, in addition to those specific to this invention. One of the output ports of microcomputer 6 controls transport controller 9. Other ports read data from keyboard 7 and send data to display 8.

Keyboard 7 is a press-button key array, which contains keys for control of all the usual VCR functions, as well as special keys used by this invention. The special keys include a SET CLASSIFICATION key, used for entering the classifications of undesired material, and an OVERRIDE key, used to disable the selective playing function and play a recording irrespective of classification. The channel selection keys commonly found on VCRs are used in this embodiment to serve the double purpose of allowing the user to enter a PIN (personal identity number). Similarly, the other keys of the VCR can serve double functions if desired.

Display 8 is used to guide the user as required. In this embodiment it comprises an eight character liquid crystal display. In other embodiments other forms of display can be used, including single LEDs or a video character generator which causes characters to be superimposed on the CRT display.

The selective viewing function of the invention is performed by the arrangement of FIG. 1 executing the program described schematically in FIG. 2 while a recordings is being played.

Referring now to FIG. 2, the program starts by scanning the keyboard to test for a key depression. If no key is pressed, the classification code, arriving from classification detector 5, is read, and an address is generated as a function of the code. A table is stored in the memory of microcomputer 6, the address of each data bit of the table corresponding to a unique classification code, and the state of each bit so addressed indicating the classification status, namely ENABLED or DISABLED. A set bit indicates DISABLED, while a clear bit indicates ENABLED. Having generated an address from the received code, microcomputer 6 then applies this address to the table, and tests the corresponding data bit. If the bit is set, microcomputer 6 signals transport controller 9 to stop replay. If the bit is clear, playing continues uninterrupted. This procedure is repeated as a loop at high speed, so that playing is quickly terminated on receipt of a classification code corresponding to undesired program content.

In order to allow authorised users to select whether a given classification code is to be enabled or disabled, the program of FIG. 2 also continually scans the keyboard, testing for depression of the SET CLASSIFICATION key. If this key is pressed, the SET CLASSIFICATION routine is performed, according to FIG. 3.

Referring now to FIG. 3, when the SET CLASSIFICATION key has been pressed, microcomputer 6 first requests, via display 8, that the user enter a PIN (personal identity number). A number is then input, in this embodiment three digits being used for security, and compared to the PIN stored in the NV memory of microcomputer 6. If the number does not match, the

4

request is repeated. If the number does match, the first classification group number is displayed, and the user is requested to enter enable or disable, using two designated keys of keyboard 7. If enable is entered, the first bit of the code array is cleared. If disable is entered, the bit is set. A test is then performed to see whether the whole array has been programed. If it has, control is returned to the operational loop, if not, the next array element is addressed, and the input cycle repeated for the next classification code.

In this embodiment the array comprises three bits, corresponding to the classifications:

1. Violent
2. Sexually explicit
3. Adult only

The coding scheme of this embodiment uses an eight bit word, so that up to 256 classifications can be supported. The 253 unused bits of the array are cleared, so that all classifications other than the three listed above are always playable. If desired, this range of classifications can be extended greatly, by increasing the size of the memory array.

When an authorised person, for example a parent, desires to watch a program of disabled classification, it may be inconvenient to re-define the classifications enabled. For convenience, this embodiment provides an override function, which is invoked by pressing the OVERRIDE key of keyboard 7. Depression of this key is detected by the test in the operational loop of FIG. 2, and results in the execution of the override routine of FIG. 4.

Referring to FIG. 4, on entry to the override routine, the PIN is requested from the user. If the PIN does not match the number stored in NV memory, the routine terminates. If the correct PIN has been entered, replay is started, and the program continues looping until the STOP key is pressed, with the result that replay continues until the STOP key is pressed, irrespective of classification.

The operation so far described assumes that the tape being played has been processed so that a classification code is included in the video signal. This is applicable, for example, to pre-recorded tapes which are available for rental, and which have been provided with suitable codes by the supplier. This will also occur if the broadcaster of a program being recorded off-air has included a suitable code in the transmission. In cases where a recording is made of a program which does not contain the code, it is possible, using this embodiment, to include a code in the recording, for subsequent use in restricting viewing.

One way this can be achieved is by entering a code, using keyboard 7, prior to or during recording. Microcomputer 6 sends the input code to classification code inserter 12, where the code is combined with the video signal being recorded. This mode is useful if, for example, a pornographic movie is being recorded off-air by a parent who desires that the children of the household will not be able to replay it.

Another way codes can be recorded is to receive them from a remote source, such as a station where broadcast programs are being monitored and appropriate classifications are being transmitted, In this case, the classification code arriving at classification code input 14 is received by classification receiver 13, which presents the received classification to an input of microcomputer 6. Microcomputer 6 then instructs classification inseter 12 to insert the current code into the recorded

4,930,158

5

signal. An application of this technique is to record programs and classifications in cases where classifications might change from time to time, or where the person operating the VCR is not present during the whole recording and is therefore not able to enter classifications manually.

The selective playing function described above is directed to simply terminating replay of a tape which is of a prohibited classification. This is a desirable capability if, for example, the objective is to prevent children watching pornographic tapes. A further capability of the invention, directed to providing means for replacing unwanted program with programme from another source, will now be described.

Referring again to FIG. 1, microcomputer 6 is provided with auxiliary output 11 and auxiliary input 12, which are used under control of the programs shown schematically in FIG. 5 to provide substitution of alternative programme on detection of prescribed codes.

Referring now also to FIG. 5, on entry to the auxiliary control program, microcomputer 6 starts playing. The detected classification code, recovered from the recording, is then read, and unless the code is a code designated as "REPLACE", the process is repeated until the STOP key is pressed. If a REPLACE code is detected, a signal is sent to auxiliary output 11. On receipt of this signal, an auxiliary device, such as another VCR, responds by playing another recording, and an auxiliary switching device selects the substitute material to be displayed instead of the signal from replay signal output 10. Microcomputer 6 continues reading replayed codes from classification detector 5 until the REPLACE code is no longer detected, at which time microcomputer 6 suspends replay by issuing a suitable command to transport controller 9. The main program tape is now positioned beyond the material to be replaced and ready to resume playing the desired program. When the auxiliary device has finished replaying the substitute program, it sends a signal to auxiliary input 12, which is received by microcomputer 6 which causes replay of the first program to resume. In some cases it may be desirable to advance quickly through unwanted program carrying the REPLACE code, for example using the fast-forward or picture-search capabilities of the transport mechanism. An application of this substitution capability of this embodiment is replacing advertisements within a recorded program with alternative advertisements or information. In this case, the auxiliary device can be a VCR which plays a recording comprising a number of advertisements or messages, each of which is longer in duration than the material to be replaced, ensuring that the main program into which the alternative material is to be inserted resumes without interruption on receipt of the auxiliary input signal at the conclusion of the inserted segment. The main program can consist of a number of segments separated by advertisements to be substituted, carrying REPLACE code, or by short breaks of, say, black program carrying REPLACE code.

The foregoing describes only some embodiments of the invention and modifications, obvious to those skilled in the art, can be made without departing from the scope of the present invention.

For example, in cases where one of several available channels of broadcast program is being recorded prior to subsequent replay, and classification codes are being received from a remote source for combining with the program, it is desirable that each classification code

6

received be identified as relating to a particular channel, and only the code relating to the channel being recorded be combined with the recorded signal. This feature is easily added to the embodiments described, especially in cases where the keyboard and microcomputer of the invention are also used to control the channel selection functions of the television receiver.

Whereas the embodiment of the invention described above relies upon signals encoded into the video portion of the video program, the invention can also be effectively implemented using signals embedded into the audio portion of the program using any of the available well-known techniques which do not interfere with normal sound reception.

Whereas the embodiment described above uses control of the tape transport mechanism to inhibit playing, the invention can also be realised using other means of suppressing replay, for example, disabling the output signal without stopping tape motion.

The invention is also not limited to application with tape as the recording medium, being equally suited to use with video disk or any other video storage technique.

The classification code used by this invention can also be used to provide other useful additional functions, such as displaying the title of the program being played, locating a particular program on a videotape, or gathering data for audience research purposes.

What I claim is:

1. A video recording playing method comprising the steps of:
   receiving, from a video storage medium, signals representative of a video program,
   processing said signals to produce video signals of a form suitable for display,
   detecting a classification code within the signals received from the storage medium, said detected code being indicative of a class of program being played,
   inputting from the user a security code number, comparing the number input to a stored number and, if the numbers are equal, enabling selection of a set of classification codes which cause at least one of suspension or termination of playing,
   comparing the detected code to said set of classification codes, and
   selectively playing the video program according to the result of the comparison.

2. A video recording playing method according to claim 1 wherein a classification code has been previously transmitted along with a video program being broadcast, said program and code being stored on a storage medium which is subsequently replayed.

3. A video recording playing method according to claim 1, wherein the classification code forms part of the signal recorded on a video recording which is one of a number of duplicate recordings made available for acquisition by the public.

4. A video recording playing method according to claim 1, comprising the further steps of inputting from the user a code to be recorded along with a video program being recorded, inserting said code into the signal being recorded, recording the combined signals on a video storage medium, and replaying the recorded signal.

5. A video recording playing method according to claim 1, comprising the further steps of receiving a video program from a first source, receiving a classifica-

4,930,158

**7**

tion code from a second source, combining said code with said program, recording the combined signals on a video storage medium, and replaying the recorded signal.

6. A video recording playing method according to claim 1 and including the further step of transmitting to an auxiliary device a signal indicating the classification of program being replayed.

7. A video recording playing method comprising the steps of:

receiving, from a video storage medium, signals representative of a video program,

processing said signals to produce video signals of a form suitable for display,

detecting a classification code within the signals received from the storage medium, said code being indicative of a class of program being played,

comparing the detected code to a set of selected codes,

selectively playing the video program according to the result of the comparison, and

transmitting to an auxiliary device a signal indicating the classification of program being replayed.

8. A video recording playing method comprising the steps of

receiving from a video storage medium signals representative of a video program,

processing said signals to produce video signals of a form suitable for display,

detecting a code within the signal received from the storage medium,

comparing the detected code to a set of selected codes, and, according to a predetermined result of the comparison:

sending a signal to an auxiliary device,

causing playing of the video program to be suspended,

waiting until a resumption signal is received, and resuming replay of the suspended program after receiving the resumption signal.

9. A method as in claim 8 comprising the further steps of inputting, from the user, a security code number, comparing the number input to a stored number, and if the numbers are equal, enabling selection of said set of selected codes.

10. A method as in claim 8 wherein said predetermined result of the comparison is one indicative of material substitution,

and further comprising the step of receiving and playing substitute program material from the auxiliary device until the resumption signal is received.

11. A method as in claim 10 further comprising the step of, during said predetermined comparison result and until said resumption signal is received, advancing playing the material using a fast forward function.

12. A video recording player which displays video on a video display means, comprising:

means for receiving, from a video storage medium, signals representative of a video program,

processing means for converting said signals into video signals of a form suitable for application to the video display means,

means for detecting a classification code within the signal received by the receiving means, said code being indicative of a class of program being played,

input means for accepting from the user a security code number;

**8**

enabling means for enabling selection of a set of classification codes which cause suspension or termination of playing, said enabling means enabling said selection only if the security code number input is the same as a stored security code number,

means for comparing the detected code to said set of classification codes, and

controller means for selectively playing the video program according to a result of the comparison.

13. A video recording player according to claim 12 including means for recording a video program transmitted from a remote location, said video program containing within the signal a classification code.

14. A video recording player according to claim 12, wherein the classification code forms part of the signal recorded on a video recording which is one of a number of duplicate recordings made available for acquisition by the public.

15. A video recording player according to claim 12, including means for inputting a code from the user, means for receiving video program from a remote source, means for combining said input code with said received program, and means for recording the combined signals on a video storage medium.

16. A video recording player according to claim 12, including means for receiving a video program from a first source, means for receiving a classification code from a second source, means for combining said code with said program, and means for recording the combined signals on a video storage medium.

17. A video recording player according to claim 12, including means for transmitting to an auxiliary device a signal indicating the classification of program being replayed.

18. A video recording player which displays video on a video display means, comprising:

means for receiving, from a video storage medium, signals representative of a video program,

processing means for converting said signals into video signals of a form suitable for application to the video display means,

means for detecting a classification code within the signal received by the receiving means, said code being indicative of a class of program being played,

means for comparing the detected code to a set of selected codes, and

controller means for selectively playing the video program according to a result of the comparison, and

means for transmitting to an auxiliary device a signal indicating the classification of program being played.

19. A video recording player comprising:

means for receiving, from a video storage medium, signals representative of a video program,

processing means for forming video signals of a form suitable for application to a video display means from said signals,

means for detecting a code within the signal received by the receiving means,

means for comparing the detected code to a set of selected codes, and

controller means for, according to the result of the comparison, sending a signal to an auxiliary device, to cause playing of the video program to be suspended, and responsive to a resumption signal to resume playing of the suspended program when the resumption signal is received.

4,930,158

9

20. A player as in claim 19 further comprising inputting means for inputting, from the user, a security code number, and

means for comparing the number input to a stored number, and if the numbers are equal, enabling selection of said set of selected codes.

21. A player as in claim 19 wherein said predetermined result of the comparison is one indicative of material substitution,

10

and further comprising means for receiving and playing substitute program material from the auxiliary device until the resumption signal is received.

22. A method as in claim 21 further comprising fast forward means for, during said predetermined comparison result and until said resumption signal is received, advancing playing the material using a fast forward function.

* * * * *

# Exhibit "B"

US004930158C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (6501st)

# United States Patent
Vogel

(10) Number: **US 4,930,158 C1**

(45) Certificate Issued: **Nov. 4, 2008**

(54) **SELECTIVE VIDEO PLAYING SYSTEM**

(75) Inventor: Peter S. Vogel, Faulconbridge (AU)

(73) Assignee: Guardian Media Technologies Ltd., La Jolla, CA (US)

**Reexamination Request:**
No. 90/007,746, Oct. 13, 2005
No. 90/008,544, Jan. 31, 2007

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | 4,930,158 |
| Issued: | May 29, 1990 |
| Appl. No.: | 07/237,175 |
| Filed: | Aug. 29, 1988 |

(30) **Foreign Application Priority Data**

Sep. 2, 1987   (AU) ................................. PI4107

(51) Int. Cl.
*G11B 27/10* (2006.01)
*H04N 7/16* (2006.01)

(52) U.S. Cl. ................ 386/94; 348/E7.06; 380/202; 725/142; 725/28

(58) Field of Classification Search .................. None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,673,318 A | 6/1972 | Olsen | 178/5.8 R |
| 3,859,457 A | 1/1975 | Kirk | 178/5.1 |
| 3,919,462 A | 11/1975 | Hartung | 178/5.1 |
| 3,919,479 A | 11/1975 | Moon | 179/1 |
| 4,068,264 A | 1/1978 | Pires | 358/122 |
| 4,114,139 A | 9/1978 | Boyd | 340/147 |
| 4,215,366 A | 7/1980 | Davidson | 358/124 |
| 4,225,884 A | 9/1980 | Block | 358/122 |
| 4,229,765 A | 10/1980 | Sanger | 358/188 |
| 4,245,245 A | 1/1981 | Matsumoto | 358/122 |
| 4,266,098 A | 5/1981 | Novak | 179/5.5 |
| 4,280,139 A | 7/1981 | Mogi | 358/165 |
| 4,325,078 A | 4/1982 | Seaton | 358/117 |

| | | | |
|---|---|---|---|
| 4,331,974 A | 5/1982 | Cogswell | 358/86 |
| 4,333,110 A | 6/1982 | Faerber | 358/165 |
| 4,338,628 A | 7/1982 | Payne | 358/120 |
| 4,348,696 A | 9/1982 | Beier | 358/188 |
| 4,354,201 A | 10/1982 | Sechet | 358/122 |
| 4,375,651 A | 3/1983 | Templin | 358/191.1 |
| 4,386,436 A | 5/1983 | Kocher | 455/151 |
| 4,398,193 A | 8/1983 | Kuniyoshi | 340/825.76 |
| 4,425,579 A | 1/1984 | Merrell | 358/86 |
| 4,484,217 A | 11/1984 | Block et al. | 358/84 |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 536261 B | 5/1982 |
| AU | 80145-82 | 10/1982 |
| AU | 56757-86 | 11/1986 |
| EP | A-O-053885 | 6/1982 |
| EP | 0112575 A1 | 12/1983 |
| EP | 0112575 B1 | 3/1986 |
| GB | 1424739 A | 2/1976 |
| GB | 8138341 | 6/1983 |
| GB | 2206759 A | 1/1989 |
| GB | 2206759 B | 1/1992 |
| JP | 59-210782 | 11/1984 |

OTHER PUBLICATIONS

Rae Atkey, "How You Can Censor Your Child's TV Viewing," The News Editorial (Adelaide) Aug. 25, 1986.

*Primary Examiner*—Ovidio Escalante

(57) **ABSTRACT**

A classification code, recorded repeatedly along with program material, is recovered on playing a video recording, and used to inhibit replay if the recovered code matches any of a set of codes specified by the user. The codes which cause replay to be inhibited can be set by the user after entering a personal identity number. The user can optionally request that a code be recorded when recording a program. Signals are optionally provided so that an auxiliary device, such as a second video player, can be controlled in response to codes recovered. One application is to prevent children viewing certain video recordings without parental permission.



**US 4,930,158 C1**

Page 2

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 4,488,179 A | 12/1984 | Krüger | 358/181 |
| 4,510,623 A | 4/1985 | Bonneau | 455/181 |
| 4,520,404 A | 5/1985 | Von Kohorn | 358/355 |
| 4,528,588 A | 7/1985 | Löfberg | 358/122 |
| 4,528,589 A | 7/1985 | Block et al. | 358/122 |
| 4,530,008 A | 7/1985 | McVoy | 358/123 |
| 4,536,791 A | 8/1985 | Campbell | 358/122 |
| 4,554,584 A | 11/1985 | Elam et al. | 358/165 |
| 4,588,857 A | 5/1986 | Arsem | 179/6.06 |
| 4,591,664 A | 5/1986 | Freeman | 179/6.06 |
| 4,595,950 A | 6/1986 | Löfberg | 358/122 |
| 4,598,288 A | 7/1986 | Yarbrough | 340/825.34 |
| 4,599,647 A | 7/1986 | George | 358/122 |
| 4,600,921 A | 7/1986 | Thomas | 340/825.31 |
| 4,602,297 A | 7/1986 | Reese | 360/14.1 |

| | | | |
|---|---|---|---|
| 4,605,964 A | 8/1986 | Chard | |
| 4,605,973 A | 8/1986 | Von Kohorn | 358/335 |
| 4,620,229 A | 10/1986 | Amano et al. | |
| 4,670,857 A | 6/1987 | Rackman | 380/4 |
| 4,685,131 A | 8/1987 | Horne | 380/20 |
| 4,695,904 A | 9/1987 | Shinyagaito | 358/342 |
| 4,696,034 A * | 9/1987 | Wiedemer | 380/230 |
| 4,718,107 A | 1/1988 | Hayes | |
| 4,729,044 A | 3/1988 | Kiesel | 360/14.3 |
| 4,750,213 A | 6/1988 | Novak | 455/67 |
| 4,787,063 A | 11/1988 | Muguet | 364/900 |
| 4,814,883 A | 3/1989 | Perine | 358/181 |
| 4,888,796 A | 12/1989 | Olivo, Jr. | |
| 4,896,354 A | 1/1990 | Inagaki et al. | |
| 4,939,596 A | 7/1990 | Takayama | 360/27 |

* cited by examiner

US 4,930,158 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**2**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims 8–11 and 19–22 is confirmed.
Claims 1–7 and 12–18 are cancelled.

* * * * *

# Exhibit "C"

# United States Patent [19]

## Vogel

[11] **Patent Number:** 4,930,160

[45] **Date of Patent:** May 29, 1990

[54] **AUTOMATIC CENSORSHIP OF VIDEO PROGRAMS**

[76] Inventor: **Peter S. Vogel,** 28 Adeline Street, Faulconbridge NSW 2776, Australia

[21] Appl. No.: **237,176**

[22] Filed: **Aug. 29, 1988**

[30] **Foreign Application Priority Data**

Sep. 2, 1987 [AU] Australia ................................. PI4107

[51] Int. Cl.⁵ ............................................. H04K 1/00
[52] U.S. Cl. ......................................... 380/23; 358/84;
358/349; 455/2; 455/4; 380/20; 340/825.34
[58] Field of Search ....................................... 380/3–5,
380/23, 20; 364/200, 900, DIG. 545; 358/84,
86, 139, 908, 349; 455/2, 4–6, 67–70;
340/825.31, 825.34

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,859,457 | 1/1975 | Kirk, Jr. | 358/86 X |
| 3,919,479 | 11/1975 | Moon et al. | 358/84 X |
| 4,331,974 | 5/1982 | Cogswell et al. | 358/86 |
| 4,520,404 | 5/1985 | Von Kohorn | 358/84 X |
| 4,530,008 | 7/1985 | McVoy | 380/23 |
| 4,605,973 | 8/1986 | Von Kohorn | 455/4 X |
| 4,620,229 | 10/1986 | Amano et al. | 358/349 |
| 4,685,131 | 8/1987 | Horne | 358/86 X |
| 4,718,107 | 1/1988 | Hayes | 455/4 |
| 4,750,213 | 6/1988 | Novak | 455/67 |
| 4,814,883 | 3/1989 | Perine et al. | 358/84 X |

*Primary Examiner*—Stephen C. Buczinski
*Assistant Examiner*—Bernarr Earl Gregory

[57] **ABSTRACT**

A video program is received from a broadcast or video recording and displayed for viewing. On receipt of a prescribed classification code or group of codes display is switched to an alternative source. The classification code can be encoded into the broadcast or tape being viewed, or can originate from a separate source. The alternative material displayed can be another broadcast, a local recording, a locally-generated pattern, or other material. The codes which cause the display to be switched to the alternative source can be set by the user after entering a personal identity number.

26 Claims, 5 Drawing Sheets



U.S. Patent    May 29, 1990    Sheet 1 of 5    4,930,160



Fig. 1

OPERATIONAL LOOP



Fig. 2

SET CLASSIFICATION



Fig. 3

U.S. Patent    May 29, 1990    Sheet 4 of 5    **4,930,160**

OVERRIDE



Fig. 4



Fig. 5

4,930,160

1

## AUTOMATIC CENSORSHIP OF VIDEO PROGRAMS

### FIELD OF THE INVENTION

The present invention relates to methods of, and apparatus for, automatic censorship of video programs. The term video program used hereinafter refers to television programs broadcast free-to-air or by cable or by satellite, and other forms of mass distribution of video programs, including distribution by video tape or other media. The term also includes an accompanying audio signal if any.

### BACKGROUND OF THE INVENTION

The need for censorship of video material is generally accepted by most societies, for the purposes of preventing the viewing of material by persons other than the target audience. Usually, such censorship takes the form of limiting access of a certain group of people, for example children, to a certain class of material, for example pornographic or violent movies. Other uses of censorship include voluntary self-censorship in cases where a recipient of a program does not wish to be exposed to certain types of program, for example scenes of great violence, advertisements which may be considered offensive, or non-program material which interrupts movies, drama or sports broadcasts.

Being the most widely accessible form of broadcasting, television is the medium with which the problem of censorship is experienced most. Traditionally, censorship of television takes the form of either preventing possibly offensive material from being broadcast in the first place, or voluntary self-censorship, that is, switching off the receiver when material which the viewer does not wish to experience is being broadcast. Another form of self-censorship, which has gained popularity since the introduction of remote controls for television sets is the phenomenon known as "zapping". Zapping involves eliminating unwanted material by muting the receiver or changing channels for the duration of the unwanted segment. While such self-censorship offers the benefit that all classes of material remain available to those who do not find them objectionable, it suffers from the inconvenience of having to anticipate the nature of broadcasts and operate the receiver appropriately. This process is tedious and error-prone, especially where the viewer wishes to suppress program material which changes rapidly in nature, for example when the viewer desires to suppress commercial messages within an otherwise unobjectionable program. Manual censorship is therefore not an entirely satisfactory solution.

It is therefore desirable to provide means whereby display of preselected classifications of program material can be automatically suppressed.

Arrangements for automatic censorship have been previously published, but suffer from a number of serious shortcomings. The main difficulty is that automatic means for discrimination of different program classifications, for example detection of television commercials, have been complex and unreliable. One technique has been to detect television commercials by the short period of black picture and silence separating them from other program material. A typical commercial-deleter of this type is described in U.S. Pat. No. 4,319,286. This system and others like it suffer from the problem that erroneous operation occurs if there is a brief period of black and silence in a broadcast at a time other than at

2

the beginning of a commercial break, or if there is no separation between commercials and other program material. Furthermore, such systems are unable to distinguish between resumption of desired program and further commercials at the conclusion of a commercial. Resumption of viewing or recording must therefore be controlled by some form of timing device, based on assumptions regarding the length of commercial breaks. If these assumptions are not correct, the system will fail in its function.

A much improved censorship means is described in U.S. Pat. No. 4,520,404. This system relies on a human operator to classify broadcasts, based on observation at a monitoring station. A suitably coded message is distributed from the monitoring station to the viewer's home, at which point a suitably-equipped decoder controls the television receiver or video recorder in accordance with the classification data generated by the human operator at the monitoring station. Although this invention significantly improves upon the reliability of previous methods, it nevertheless suffers significant limitations. One limitation is the difficulty of accurately predicting at the monitoring station when a change of program is going to occur, making the system somewhat error prone. Another limitation is that when the system is used under the control of one party to control the viewing of another party, for example used by parents to limit viewing by children, it is necessary to provide control means by which the class of program to be censored can be selected, and it is therefore possible for the other party to use these controls to disable the censorship, thereby defeating the function of the system. Yet another limitation is that during the period that unwanted material is being censored, the receiver is simply disabled. The viewer is therefore periodically presented with a blank screen and/or silence, which may have the undesirable effect of causing alarm when program suddenly resumes, or may be mistaken for a receiver malfunction.

The prior art methods are also deficient in that they do not provide means whereby an authorized person can selectively disable viewing of certain classifications of pre-recorded video programs.

### SUMMARY OF THE INVENTION

The present invention is directed to providing novel and improved means and method of receiving video programs whereby the censorship function is provided automatically, substantially resolving the abovementioned shortcomings of the prior art as well as providing other benefits.

According to a first aspect of the present invention, there is provided a video program receiving method capable of automatically censoring video programs comprising the steps of receiving a video program, with accompanying audio if any, receiving a classification signal indicative of the content of the program being received, decoding the classification signal and, according to functions selected by the user, causing the receiver to direct to its output alternative program material for the duration of program of selected classification.

According to a second aspect of this inventive concept, apparatus for receiving and automatically censoring video program is also provided, and comprises a video program receiver, a classification signal receiver, a controller equipped to decode said received signal and

4,930,160

| 3 | 4 |

to control switching means which, according to functions selected by the user at the receiving station, cause the receiver to direct to its output alternative program material for the duration of program of selected classification.

The term "receiver" used herein is defined in the broad sense of apparatus for converting television signals (and their associated sound signals) into visual and audible signals, or apparatus for converting modulated carrier signals into video and/or audio signals suitable for display by video monitors or audition via amplifiers and loudspeakers. For example, the term receiver includes off-air domestic television sets, as well as apparatus known commonly as a "video monitor". The term "receive" is used in the broad sense of accepting signal from any signal conveyance means, for example, from an antenna, cable, optical fiber, magnetic tape, or optical disk.

Some embodiments of this invention also include an arrangement for enabling access to selection of classifications to be censored only upon entering of a security code, or personal identification number (PIN), by the user.

BRIEF DESCRIPTION OF THE DRAWINGS

Some embodiments of the present invention will now be described, by way of example only, with reference to the drawings in which:

FIG. 1 is a schematic block diagram of a first embodiment of the invention in which the program classification is encoded into the vertical interval of the video signal;

FIG. 2 is a schematic diagram of the operational loop of the program executed by the microcomputer of the first embodiment;

FIG. 3 is a schematic diagram of the software used in either embodiment for setting classifications;

FIG. 4 is a schematic diagram of the software used in either embodiment for overriding the censorship function; and

FIG. 5 is a schematic block diagram of a second embodiment of the invention in which the program classification is received by the invention from a transmission source other than the program to be censored.

DETAILED DESCRIPTION

As seen in FIG. 1 this embodiment of the invention comprises the conventional components of a television receiver or monitor, including audio amplifier 11, loudspeaker 12, CRT driver 10 and CRT 13. Under normal conditions, the sources of video and audio are selected from video input 3 and audio input 1 respectively. However when the selector means, relay 7 is energized, alternate audio input 2 and alternate video input 4 are selected instead. Both sets of audio and video inputs may derive from any source, for example a television tuner or video tape player.

The operation of this embodiment relies on the presence of a program classification code within the video signal. This can be provided in a number of well known ways which ensure that the presence of such codes do not interfere with the normal operation of television receivers. The method used in this embodiment is encoding of a digital word in the form of black and white transitions located on line 16 of the video signal. This position is chosen so as to be invisible on the CRT display. The technology for this form of signalling is well known, being commonly used for data broadcasting

services such as Teletext. The classification may be pre-recorded on tapes being broadcast or played locally, or inserted in a video signal prior to transmission at the broadcasting station at the time of broadcast. The means for inserting such signals is well known.

Upon arrival at video input 3 of the invention, as well as being fed to the display system, the video portion of the program is fed to line code extractor 5, which comprises means for isolating the desired line (in this embodiment line 16), extracting the digital word from that line, and presenting it as an output readable by microcomputer 6.

Microcomputer 6 is a self-contained "single chip computer" including RAM, ROM, IO ports, CPU and NV (non-volatile) memory. Of course, microcomputer 6 may also perform many other functions required by the receiver, as well as those of this invention. One of the output ports of microcomputer 6 controls relay 7. Other ports read data from keyboard 8 and send data to display 9.

Keyboard 8 is a press-button key array, which contains keys for control of all the usual television functions, as well as special keys used by this invention. The special keys include a SET CLASSIFICATION key, used for entering the classifications to be censored, an OVERRIDE key, used to disable the censorship function, and a RESUME key, used to resume censorship after OVERRIDE. The usual channel selection keys of the receiver of this embodiment serve the double purpose of allowing the user to enter a PIN (personal identity number). Similarly, the other keys can serve double functions if desired.

Display 9 is used to signal the user as required. In this embodiment it comprises an eight character liquid crystal display. In other embodiments other forms of display can be used, including single LEDs, or a video character generator which causes characters to be superimposed on the CRT display.

The censorship function of the invention is performed by the arrangement of FIG. 1 executing the program described schematically in FIG. 2.

Referring now to FIG. 2, the program starts by scanning the keyboard to test for a key depression. If no key is pressed, the classification code, arriving from line code extractor 5, is read, and an address is generated as a function of the code. A table is stored in the RAM of microcomputer 6, the address of each data bit of the table corresponding to a unique classification code, and the state of each bit so addressed indicating the classification status, namely ENABLED or DISABLED. A set bit indicates DISABLED, while a clear bit indicates ENABLED. Having generated an address from the received code, microcomputer 6 then applies this address to the table, and tests the corresponding data bit. If the bit is set, relay 7 is energized, causing the video and audio signals to be switched to the alternate sources. If the bit is clear, relay 7 is released, with the opposite effect. This procedure is repeated as a loop at high speed, so that the operation of relay 7 follows instantaneous changes in classification codes arriving at the video input of the invention.

In order to allow authorized users to select whether a given classification code is to be enabled or disabled, the program of FIG. 2 also continually scans the keyboard, testing for depression of the SET CLASSIFICATION key. If this key is pressed, the SET CLASSIFICATION routine is performed, according to FIG. 3.

4,930,160

5

Referring now to FIG. 3, when the SET CLASSIFI-CATION key has been pressed, microcomputer 6 first requests, via display 9, that the user enter the PIN. A number is then input, in this embodiment three digits being used for security, and compared to the PIN stored in the NV memory of microcomputer 6. If the number does not match, the request is repeated. If the number does match, the first classification group number is displayed, and the user is requested to enter enable or disable, using two designated keys of keyboard 8. If enable is entered, the first bit of the code array is cleared. If disable is entered, the bit is set. A test is then performed to see whether the last element of the array has been programmed. If it has, control is returned to the operational loop, if not, the next array element is addressed, and the input cycle repeated for the next classification code.

In this embodiment the array comprises three bits, corresponding to the classifications:

1. Advertisement (commercial product or service promotion)
2. Non-program material (includes advertisements, station identification, community service announcements, commentary during movies etc.)
3. Restricted. Programs deemed by the government censors to be unsuitable for viewing by children.

The coding scheme of this embodiment uses an eight bit word, so that up to 256 classifications can be supported. The 253 unused bits of the array are cleared, so that all classifications other than the three listed above are always enable. If desired, this range of classifications can be extended greatly, by increasing the size of the memory array.

When an authorized person, for example a parent, desires to watch a program of disabled classification, it may be inconvenient to re-define the classifications enabled. For convenience, this embodiment provides an override function, which is invoked by pressing the OVERRIDE key of keyboard 8. Depression of this key is detected by the test in the operational loop of FIG. 2, and results in the execution of the override routine of FIG. 4.

Referring to FIG. 4, on entry to the override routine, the PIN is requested from the user. If the PIN does not match the number stored in NV memory, the routine terminates. If the correct PIN has been entered, relay 7 is released, and the program continues looping until the RESUME key is pressed, with the result that no censoring action occurs until the RESUME key is pressed.

A second embodiment of the invention is shown in FIG. 5. This embodiment is similar to the first embodiment, except that classification codes are received from a source separate from the source of video program. In this case, classification receiver 14 is provided to receive classification signal input 15, which can arrive from any source, for example a radio transmitter distinct from the transmitter broadcasting the video program. This embodiment of the invention is not suited to operation with prerecorded tapes as program source. Operation of this embodiment is the same as the first embodiment, except that classification codes are read from classification receiver 14, rather than line code extractor 5, by microcomputer 6. The software executed by microcomputer 6 is also the same. The capabilities of both embodiments could easily be combined.

The foregoing describes only some embodiments of the present invention and modifications, obvious to

6

those skilled in the art, can be made without departing from the scope of the present invention.

For example, in cases where a broadcast program is being viewed, more than one channel of broadcast is available, and the classification signal is being received from a source other than the broadcast being received, it is desirable that each classification code received be identified as relating to a particular channel, so that censorship can be based on which channel is being viewed or recorded. This feature is easily added to the embodiments described, especially in cases where the keyboard and microcomputer of the invention are also used to control the channel selection functions of the television receiver.

For the purpose of implementing the invention without needing to modify the television receiver, the invention can comprise a standard television receiver in combination with a special controller which controls operation of the receiver by means of the remote control interface of the television receiver, if the receiver is equipped with remote control. That is, the censorship controller is equipped with interface means compatible with the remote control communication standard, for example an infra-red transmitter, so muting, blanking, channel-changing, or other censorship actions can be effected using unmodified receiving equipment. The channel-change function can provide the facility of displaying alternative material during periods of censorship. For example, a suitable pattern generator tuned to an unused television channel could be used to provide "electronic wallpaper" during commercial breaks. In some applications it may be desirable to implement some functions of the invention, such as PIN entry, in the remote controller, and other functions, such as the censorship function, in the receiver.

Whereas the switching means of the embodiments described herein is a relay, any form of suitable switch, such as a solidstate arrangement, can be used.

The alternative material selected during censorship periods can originate from a remote source, for example another television broadcast, or locally, for example from a video disk or tape player. The local source may also be simply a black signal generator. Furthermore, the invention is not limited to providing only one alternative program source.

Whereas one embodiment of the invention described above relies upon signals encoded into the video portion of the received program, the invention can also be effectively implemented using signals embedded into the audio portion of the program, using any of the available well-known techniques which do not interfere with normal sound reception.

What I claim is:

1. A video program reception method comprising the steps of:

storing in memory means a set of codes descriptive of video program classifications,

receiving a video signal and associated audio signal if present,

receiving a program classification code descriptive of said video signal,

accessing said memory means and comparing the contents thereof with said code, and,

if the result of said comparison indicates that the received program is to be displayed, causing the received video signal to be selected for display,

if the result of said comparison indicates that an alternative video signal is to be displayed, causing an

4,930,160

**7**

alternative source of video signal to be selected for display; and

displaying the selected video signal on a video display means.

2. A video program reception method according to claim 1, wherein the alternative source of video signal originates from a remote transmitter.

3. A video program reception method according to claim 1, wherein the alternative source of video signal is local to the receiving station.

4. A video program reception method according to claim 1, comprising the further steps of:

inputting from the user a personal identity number,

comparing said number to a stored number, and if said numbers are equal,

permitting the user to alter the codes stored within said memory means.

5. A video program reception method according to claim 4, wherein the alternative source of video signal originates from a source remote to the receiver.

6. A video program reception method according to claim 4, wherein the alternative source of video signal is local to the receiving station.

7. A video program reception method according to claim 6, wherein the alternative source of video signal is a local video pattern generator equipped to generate at least a black pattern.

8. A video program reception method according to claim 4, wherein the program classification code is encoded into the video component of the program.

9. A video program reception method according to claim 4, wherein the program classification code is encoded into the audio component of the program.

10. A video program reception method according to claim 4, wherein the program classification code is not encoded into the program being received but is received from a separate source.

11. A video program reception method according to claim 1, wherein the program classification code is encoded into the video component of the program.

12. A video program reception method according to claim 1, wherein the program classification code is encoded into the audio component of the program.

13. A video program reception method according to claim 1, wherein the program classification code is not encoded into the program being received but is received from a separate source.

14. A video program receiver comprising:

a video signal receiver,

a program classification code receiver,

a program classification code memory,

means for accessing said memory and comparing the contents thereof with received codes,

**8**

selector means equipped to cause a received video signal to be selected for display if the result of said comparison indicates that the received program is to be displayed and to cause an alternative source of video signal to be selected for display if the result of said comparison indicates that an alternative video signal is to be displayed, and

means for displaying the selected video signal.

15. A video program receiver according to claim 14, wherein the alternative source of video signal originates from a remote transmitter.

16. A video program receiver according to claim 14, wherein the alternative source of video signal is local to the receiving station.

17. A video program receiver according to claim 14, further comprising:

means for inputting from the user a personal identity number,

means for comparing said number to a stored number, and control means permitting the user to alter the contents of said memory only if the compared numbers are equal.

18. A video program receiver according to claim 17, wherein the alternative source of video signal originates from a source remote to the receiver.

19. A video program receiver according to claim 17, wherein the alternative source of video signal is local to the receiving station.

20. A video program receiver according to claim 19, wherein the alternative source of video signal is a local video pattern generator equipped to generate at least a black pattern.

21. A video program receiver according to claim 17, including means for deriving the program classification code from the video component of the program.

22. A video program receiver according to claim 17, including means for deriving the program classification code from the audio component of the program.

23. A video program receiver according to claim 17, including means for deriving the program classification code from a source other than the program being received.

24. A video program receiver according to claim 14, including means for deriving the program classification code from the video component of the program.

25. A video program receiver according to claim 14, including means for deriving the program classification code from the audio component of the program.

26. A video program receiver according to claim 14, including means for receiving program classification code from a source other than the program being received.

*  *  *  *  *

# Exhibit "D"

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/007,733 | 09/26/2005 | 4930160 | 487132800100 | 2180 |

37086    7590    12/04/2008
NOVAK DRUCE & QUIGG, LLP
(NDQ REEXAMINATION GROUP)
1000 LOUISIANA STREET
FIFTY-THIRD FLOOR
HOUSTON, TX  77002

| EXAMINER |
|---|
| |

| ART UNIT | PAPER NUMBER |
|---|---|
| | |

DATE MAILED: 12/04/2008

Please find below and/or attached an Office communication concerning this application or proceeding.

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

David L. Fehrman
Morrison and Foerster, LLP
555 W. Fifth St. Suite 3500
Los Angeles, CA 90013

**MAILED**

**DEC 04 2008**

CENTRAL REEXAMINATION UNIT

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/007,733*.

PATENT NO. *4930160*.

ART UNIT *3992*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

 United States Patent and Trademark Office

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

MORRISON & FOERSTER, LLP
555 WEST FIFTH STREET
SUITE 3500
LOS ANGELES, CA 90013-1024

**MAILED**

**DEC 04 2008**

CENTRAL REEXAMINATION UNIT

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/008,243*.

PATENT NO. *4930160*.

ART UNIT *3992*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

 **United States Patent and Trademark Office**

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/008,243 | 01/08/2007 | 4930160 | 8086.002.RXUS00 | 6416 |

37086          7590 .          12/04/2008

NOVAK DRUCE & QUIGG, LLP
(NDQ REEXAMINATION GROUP)
1000 LOUISIANA STREET
FIFTY-THIRD FLOOR
HOUSTON, TX 77002

| EXAMINER |
|---|
|  |

| ART UNIT | PAPER NUMBER |
|---|---|
|  |  |

DATE MAILED: 12/04/2008

Please find below and/or attached an Office communication concerning this application or proceeding.

| | Control No. | Patent Under Reexamination |
|---|---|---|
| **Notice of Intent to Issue** **Ex Parte Reexamination Certificate** | 90/007,733, *90/008,293* | 4930160 |
| | Examiner | Art Unit | |
| | OVIDIO ESCALANTE | 3992 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

1. ☒ Prosecution on the merits is (or remains) closed in this *ex parte* reexamination proceeding. This proceeding is subject to reopening at the initiative of the Office or upon petition. *Cf.* 37 CFR 1.313(a). A Certificate will be issued in view of
   (a) ☒ Patent owner's communication(s) filed: *25 September 2008*.
   (b) ☐ Patent owner's late response filed: _____.
   (c) ☐ Patent owner's failure to file an appropriate response to the Office action mailed: _____.
   (d) ☐ Patent owner's failure to timely file an Appeal Brief (37 CFR 41.31).
   (e) ☐ Other: _____.

   Status of *Ex Parte* Reexamination:
   (f) Change in the Specification:    ☐ Yes ☒ No
   (g) Change in the Drawing(s):    ☐ Yes ☒ No
   (h) Status of the Claim(s):

      (1) Patent claim(s) confirmed: *3,6,7,16,19 and 20*.
      (2) Patent claim(s) amended (including dependent on amended claim(s)): _____.
      (3) Patent claim(s) cancelled: *1,2,4,5,8-15,17,18 and 21-26*.
      (4) Newly presented claim(s) patentable: _____.
      (5) Newly presented cancelled claims: _____.

2. ☒ Note the attached statement of reasons for patentability and/or confirmation. Any comments considered necessary by patent owner regarding reasons for patentability and/or confirmation must be submitted promptly to avoid processing delays. Such submission(s) should be labeled: "Comments On Statement of Reasons for Patentability and/or Confirmation."

3. ☐ Note attached NOTICE OF REFERENCES CITED (PTO-892).

4. ☐ Note attached LIST OF REFERENCES CITED (PTO/SB/08).

5. ☐ The drawing correction request filed on _____ is: ☐ approved    ☐ disapproved.

6. ☐ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).
   a)☐ All  b)☐ Some*   c)☐ None   of the certified copies have
          ☐ been received.
          ☐ not been received.
          ☐ been filed in Application No. _____.
          ☐ been filed in reexamination Control No. _____.
          ☐ been received by the International Bureau in PCT Application No. _____.

   * Certified copies not received: _____.

7. ☐ Note attached Examiner's Amendment.

8. ☐ Note attached Interview Summary (PTO-474).

9. ☐ Other: _____.

cc: Requester (if third party requester)

Application/Control Number:                                             Page 2
90/007,733; 90/008,243
Art Unit: 3992

## DETAILED ACTION

1.      This action is in response to the Patent Owner's Response filed on September 25, 2008

and the personal Interview held on October 16, 2008.


### *Expired Patent and Status of Claims*

37 CFR 1.530(j) states that "[n]o amendment may be proposed for entry in an expired

patent. Moreover, no amendment, <u>other than the cancellation of claims</u>, will be incorporated into

the patent by a certificate issued after the expiration of the patent."


The Patent Owner has complied with the issues set forth for an expired patent and thus

the amendment submitted after the expiration of this instant patent is entered and the status of the

claims is now as follows:

Original claims 1-2, 4-5, 8-15, 17-18 and 21-26 <u>are canceled</u>;

Original claims 3, 6, 7, 16, 19, 20 <u>are pending</u>.


### *Priority Determination*

*"local to the receiving station"*

As stated in the Australian Patent Document P1-4107 at pages 12-13:

"Censorship controller 7 receives the extracted classification word, and compares it with
a range of classifications previously entered by the operator using user interface 8. If the
current classification matches one of those selected to be censored by the operator, censor
output 9 becomes activated. Censor output 9 activates control input 10 of the video tape
recorder and/or control input 11 of the television receiver, causing certain automatic
censorship actions to happen. The desired actions are selected by the operator and can
include the following examples : ...

Application/Control Number:                                        Page 3
90/007,733; 90/008,243
Art Unit: 3992

      **d) Switch to alternative programme  Example:**
             **Replace advertisements <u>with soothing images of tropical fish</u>,**
             **news and information items from Teletext or other source,**
             **or alternative advertisements from another source."**

As previously argued, the Examiner notes the PI-4107 priority document makes no specific reference to whether or not the alternative program is generated or received from a "local" source.

As disclosed in PI-4107, examples of "alternative programs" can be e.g., to replace advertisements with "soothing images of tropical fish", "news and information items from Teletext" or other source or alternative advertisements from another source.

In the interview held on October 16, 2008, the Patent Owner explained that with the examples given in the Australian Patent, it is clear the "images of tropical fish" is not from "another source". That is, with the three examples, both the news and information items come from either Teletext or other source and the alternative advertisements come from another source.

The Patent Owner maintained that this clearly shows the "images of tropical fish" are <u>not</u> from another source and hence would come from a local source

As stated in the Patent Owner Interview Summary filed on October 29, 2008,

> "...the fact that the soothing images of tropical fish were not designated as coming from another source, while the other two of the three examples were, can be seen as supporting the declarants's conclusion that to him, "it is clear the tropical fish image generation described is locally generated.""

Application/Control Number:                                   Page 4
90/007,733; 90/008,243
Art Unit: 3992

The Examiner agrees, the cited portions of the Australian Patent appears to disclose the images of tropical fish may not from the same source as the news and information and alternative advertisements. The Examiner, however, notes that this in no way entails or clarifies that the images of tropical fish are locally sourced. The mere showing that the images of tropical fish are not from the same source as the news and information items or alternative advertisements does not bring to light whether the images of tropical fish were locally sourced. The Examiner notes that the same argument holds true for the news and information items and alterative advertisements. Both come from another source or other source, but "other source" or "another source" is not defined. The only clear source that is listed is "Teletext". The "other/another source" is not defined and shows no relationship or comparison between even being a remote source or local. The Examiner however has accepted that the news and information items and the alternative advertisements were remotely sourced based upon its use of Teletext and since it is generally known in the art that Teletext is broadcast from a remote source and advertisements are likewise remotely generated.

The Patent Owner, in their Interview Summary, acknowledged that "it is more probable and logical that the first images would be sourced locally.

The Examiner notes that this conclusion was made based on an argument the Examiner raised with the issue that it was conceivable at the time to have tropical fish images being broadcast on a specific channel. The Examiner noted that since it was technologically possible,

Application/Control Number:                                    Page 5
90/007,733; 90/008,243
Art Unit: 3992

then the disclosed tropical fish images can be seen by one of ordinary skill in the art as coming

from a remote source.

     The Examiner reiterates that just because a certain scenario is "more probable" to occur,

it does not mean that the more probable scenarios occurs or is supported by the Australian

priority document.

     As noted by the Patent Owner in their response (filed on September 25, 2008), "the test

for sufficiency of support in a parent application is whether the disclosure of the application

relied upon 'reasonably conveys to the artisan that the inventor had possession at the time of the

later claimed subject matter.'"

> The Patent Owner acknowledges" the presence of the words "clear, and concise" in 35
> U.S.C. §112 ¶ 1, but the existence of these words does not read them into the standard for
> written description requirement. While the statue severs as a basis, it is the Courts'
> interpretations that control application of the law. As evidence by the numerous opinions
> of the Courts with regard to the written description requirement, the settled law in this
> regard does not require a clear and concise description as is being asserted by the
> Examiner.

## 35 U.S.C. 112 1st paragraph:

> The specification shall contain a written description of the invention, and of the manner
> and process of making and using it, in such full, clear, concise, and exact terms as to enable any
> person skilled in the art to which it pertains, or with which it is most nearly connected, to make
> and use the same, and shall set forth the best mode contemplated by the inventor of carrying out
> his invention.

Application/Control Number:                                            Page 6
90/007,733; 90/008,243
Art Unit: 3992

The Examiner acknowledges *35 U.S.C. 112, first paragraph,* sets forth the minimum

requirements for the quality and quantity of information that must be contained in the patent to

justify the grant.

In addition, as per *MPEP 2163 [R-5]*

> To satisfy the written description requirement, a patent specification must describe the
> claimed invention in sufficient detail that one skilled in the art can reasonably conclude
> that the inventor had possession of the claimed invention. See, e.g., Moba, B.V. v.
> Diamond Automation, Inc., 325 F.3d 1306, 1319, 66 USPQ2d 1429, 1438 (Fed.
> Cir. 2003); Vas-Cath, Inc. v. Mahurkar, 935 F.2d at 1563, 19 USPQ2d at 1116.

As per *MPEP 2163 [R-5] (II)(A)(2)(b*

> To comply with the written description requirement of 35 U.S.C. 112, para. 1, or to be
> entitled to an earlier priority date or filing date under 35 U.S.C. 119, 120, or 365(c), **each claim
> limitation must be expressly, implicitly, or inherently supported in the originally filed
> disclosure.** When an explicit limitation in a claim "is not present in the written description
> whose benefit is sought **it must be shown that a person of ordinary skill would have
> understood, at the time the patent application was filed, that the description requires that
> limitation.**" Hyatt v. Boone, 146 F.3d 1348, 1353, 47 USPQ2d 1128, 1131 (Fed. Cir. 1998). See
> also In re Wright, 866 F.2d 422, 425, 9 USPQ2d 1649, 1651 (Fed. Cir. 1989).

The Examiner maintains, in view of MPEP 2163 that **support may not be established by**

probabilities or possibilities. The mere fact that a certain thing may result from a given set of

circumstances is not sufficient.

The Patent Owner's attempted to show that a person of ordinary skill (i.e. Novak and

Vogel declarations) would have concluded that the cited portions in the Australian priority

document showed a "local" source of information.

Application/Control Number:                                      Page 7
90/007,733; 90/008,243
Art Unit: 3992

The only factual argument from the declarations is based on their opinion that since the

"tropical fish images" are not from another source or other source then it would be from a local

source.

However, as further noted, "other" or "another" source is not clearly defined and

furthermore, the absence of description from what source the images of tropical fish comes from

would not default to a non-disclosed local source. <u>At best, it is a source that is not the same as</u>

<u>the other two sources.</u>

Thus, the Examiner maintains that the priority document does not support the claimed

limitation of "local to the receiving station" and thus does not grant the Patent Owner's priority

to the Australian application for those claims that recite "local to the receiving station".

### *Novak in view of Motoyama*

The Patent Owner states that Motoyama teaches away from being combined with Novak

because Novak will never output a high noise signal as required by Motoyama, and thus Novak

will never trigger a response from Motoyama to display a locally generated alternative source of .

video signal.

The Patent Owner maintains that Motoyama's microprocessor requires a "detect signal"

that causes the microprocessor to output its lost signal notification, but the Novak reference does

not supply such a detect signal.

In the Interview Summary, the Patent Owner states with regards to figure 1 of the Novak

reference, the "Alternative Program Signal 12" is shown to seemingly constantly flow into

Application/Control Number:                                    Page 8
90/007,733; 90/008,243
Art Unit: 3992

censorship device 102. There is no discussion in the Novak reference of a signal sent that

initiates transmission of Alternative Program Signal 12. Since this Alternative Program Signal 12

in the Novak reference appears to always be input and available to be switch to, it was agreed

that the Alternative Program Signal 12 is more like a broadcast signal which would not be a local

signal.

In the Interview Summary, the Patent Owner notes the fact that the Novak reference does

not send a signal that could initiate transmission of its Alternative Program Signal 12 also means

the Novak reference does not have a "detect signal" capable of initiating output of Motoyama's

alternative source of video content (lost signal notification) from Motoyama's microprocessor.

In the Patent Owner's after final response, the Patent Owner contends Novak deals with

displaying alternative programming in response to an event with an incoming program; namely

the event of content restriction based on censorship. Motoyama on the other hand deals with

sensing that a lost signal condition exists; effectively, there is no "current program" aspect in

Motoyama. What the viewer in Motoyama is informed of is the "lost signal" condition.

Therefore, Motoyama does not presuppose a "current program [that] is not being showed," but

merely reacts anytime a high noise condition is detected.

*Examiner's Response*

Novak discloses, as shown in section 102 of FIG. 1, capability for switch (11) to output

an alternate signal (12) is provided by also inputting alternate signal (12) to a source selection

switch (11) which has been arranged to switch its output between the unedited program signal

(1) and the alternate signal (12) as commanded.

Application/Control Number:                                    Page 9
90/007,733; 90/008,243
Art Unit: 3992



**FIG. 1**

As shown in the above figure, Alternate Program 12 along with Unedited Input Signal 1

is input into the Source Selection Switch 11. The Examiner agrees with the Patent Owner that the

Alternative Program Signal 12 is constantly being input and available to be switch to (or at least

input in the same manner as Unedited Input Signal 1 would be inputted).

The Novak patent also discloses that the alternate signal input 12 **may** in some

embodiments comprises a zero value signal, i.e., no signal, such as when it would be desired to

replace the portions to be deleted from unedited broadcast signal with no other program material.

*Novak Declaration (December 03, 2007)*

Application/Control Number:                          Page 10
90/007,733; 90/008,243
Art Unit: 3992

The Novak Declaration discloses that his patent teaches that a result of editing the
broadcast signal <u>would be a blanked screen.</u> The Novak declaration also acknowledges that the
"censored signal" can be the <u>absence</u> of any signal at all.

The Novak declaration states that the '213 patent <u>does not teach or suggest a technique</u>
<u>that allows television manufactures to **build into the television set itself** control circuitry that</u>
<u>generates a censoring signal, the content of which, when displayed during periods of censorship,</u>
<u>was sure to not confuse users that their television was manufacturing.</u>

<u>Novak discloses that is patent does not disclose incorporate the circuitry of the system in</u>
<u>a television. In addition, the patent does not disclose **affirmatively displaying any signal** during</u>
<u>censorship.</u> Instead the patent teaches an embodiment where "no signal" is sent to the display
during period of censorship

The Examiner, as previously noted, disagreed with the Novak declaration since the
arguments made by Novak was made on the pretext that "local" is defined as not being "within a
television set".

The Examiner notes that as defined by the Vogel Patent, "the alternative material selected
during censorship periods can originate from a remote source, for example another television
broadcast, or locally, for example from a video disk or tape player. The local source may also be
simply a black signal generator."

The Examiner notes that the only local source of video disclosed by Vogel includes video
disk or tape players and black signal generators. The Examiner also notes that Vogel does not
disclose the exact location of the black signal generator other than the fact that it is local. <u>The</u>

Application/Control Number:                                    Page 11
90/007,733; 90/008,243
Art Unit: 3992

Examiner admits that previously (at least with respect to the previous advisory action) he had
erroneously included the signal generator to be "within the television set" itself.

The Examiner had previously noted on record that the instant disclosure, as originally
filed, does not appear to provide support for a recitation in which the "alternative source of video
signal" is recited as being located within a "television set" (see response mailed on October 1,
2007). Thus, contrary to the Patent Owner's statement (page 18 of the response filed on
September 25, 2008), claims 3, 6, 7, 16, 19 and 20 should not be construed as within the
television set itself. Furthermore, the Patent Owner admits that if the rejection is withdrawn this
claim interpretation is unwarranted and unnecessary.

Thus, the Examiner notes that "local" remains as being defined consistent with the
disclosed description in Vogel and thus "the alternative material selected during censorship
periods can originate [from a remote source, for example another television broadcast, or]
locally, for example from a video disk or tape player. The local source may also be simply a
black signal generator."

The Examiner relied on this claim interpretation to dispute the Novak declaration since
Novak's main argument was based on the fact that the receiver was not included within a
television set.

The Examiner agrees that if the claim was narrowly construed to be limited to "within the
television set itself" then Novak would fail to anticipate the claim. The Examiner however, did
not accord the definition set by the Novak declaration in construing the claims but instead gave
the defined definition and interpretation that was consistent with the Vogel Patent.

Application/Control Number:                           Page 12
90/007,733; 90/008,243
Art Unit: 3992

In Motoyama, a microprocessor 30 is provided and it produces an alternative video signal
in response to a detect signal of switch 22. The alternative video signal is applied from the
microprocessor 30 to the video/RGB switch 36 and then through the video//RGB circuitry 38 to
the cathode ray tube 40 to visually announce the lost carrier condition. Motoyama discloses the
alternate signal is applied when the disable signal is present at switch 22

The Examiner agrees with the Patent Owner that the visual announcement of Motoyama
is employed only in response to a noise detect signal.

The Examiner disagrees that it would not have been obvious to use a message/visual
announcement system in Novak. However, in view of the arguments presented in the last
Interview, the Patent Owner pointed out that with Novak the "Alternative Program Signal 12" is
shown to seemingly constantly flow into censorship device 102. There is no discussion in the
Novak reference of a signal sent that initiates transmission of Alternative Program Signal 12.
Since this Alternative Program Signal 12 in the Novak reference appears to always be being
input and available to be switch to, it was agreed that the Alternative Program Signal 12 is more
like a constant signal and not one that activates or retrieved based upon a trigger.

Any proposed combination with Novak would require a message to be constantly input
into the switch of Novak. In Motoyama a noise detect signal is used to trigger the output of a
message. No such detect signal is disclosed by Novak. Instead the processor 17 sends an
enabling signal to control the input of source selection switch 11. The alternate source is

Application/Control Number:.                                    Page 13
90/007,733; 90/008,243
Art Unit: 3992

presumed to be in place or ready for output. There is no need to trigger the activation of an

alternate source since the alternate source is already present.

      Each of the embodiments disclosed by Novak is directed to either displaying an

alternative program or a blank screen. The Examiner notes a blank screen is a result of no-signal ·

being sent, that is, nothing will be output. Thus, Novak specifically discloses of not displaying an

image and thus does not disclose selecting an alternative video program to be displayed. After

further review of Novak it is clear that no disclosure of what this alternate signal other than the

signal being a zero value signal, no signal or no other program material is discussed. Thus, there ·

appears to be no visual image that would be displayed. While Motoyoma provides for a message

generation feature, this processor is within the television set whereas the editing device of Novak

is outside the television set. In addition, the Examiner notes that when properly combined, the

microprocessor of Motoyama would have to be constantly fed into the source selection switch.    .

This disclosure/embodiment is not discussed/suggested by either Novak or Motoyama.


      The Examiner notes that the combination of Novak and Motoyama fails to render

obvious the claimed limitations of providing a locally generated message in combination with

the rest of the limitation of the claims. While, local generated messages are well known in the

art, the circuitry of Novak prevents the adoption of the messages that are stored as in the system

of Motoyama since the system would require a constant feeding of a message to the source

selection switch. Such disclosure is neither apparent nor reasonable in view of Novak. While

that type of requirement is not disclosed by the claims, it is undoubtedly required if Novak is to

be combined with Motoyama for the acceptance of the message of Motoyama.

Application/Control Number:          Page 14
90/007,733; 90/008,243
Art Unit: 3992

In other words Novak does not allow for any displayable content, and its circuit design is

evidence of that type of system that would prevent content from being displayed. Novak is

designed for the acceptance of zero value signal or the like for the non-displaying of program

signals. In combination, the Examiner also notes that the signal present in Motoyama is activated

only when there high noise that is cause by no program being received. This will only notify a

user of lost of program and not of any other type of detected issue.


Thus, the Examiner agrees with the Patent Owner's argument and will not maintain the

rejection of Novak in view of Motoyama.


## *Secondary Considerations*

### *Thomas E. Coverstone (May 27, 2008)*

Discussed the licensing of the '160 Patent to more than thirty-seven companies. Mr.

Coverstone stated that all modern-day television that implement V-chip technology do so by

delivery a true, locally generated alternate signal (not a different channel or a message

transmitted by the TV station) during program censorship.

Mr. Coverstone provides a claim chart equating the claims of the '160 patent to at least

12 infringing devices.

In the May 27, 2008 Patent Owner response, the Patent Owner contends that licenses are

often used as evidence of commercial success. The evidentiary value of the licenses depends to a

great extent on the nexus between the licenses and the claimed invention.

Application/Control Number:                                    Page 15
90/007,733; 90/008,243
Art Unit: 3992

The Examiner notes that the Patent Owner acknowledges that in *In re GPAc, Inc.*, the court found that a nexus was not established just because a long list of licenses was presented as evidence of commercial success. The Examiner notes that the provided claim charts attempt to provide the needed nexus.

The Examiner acknowledges to be given substantial weight in the determination of obviousness or nonobviousness, evidence of secondary considerations must be relevant to the subject matter as claimed, and therefore the examiner must determine whether there is a nexus between the merits of the claimed invention and the evidence of secondary considerations. *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 305 n.42, 227 USPQ 657, 673-674 n. 42 (Fed. Cir. 1985), cert. denied, 475 U.S. 1017 (1986). The term "nexus" designates a factually and legally sufficient connection between the objective evidence of nonobviousness and the claimed invention so that the evidence is of probative value in the determination of nonobviousness. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 7 USPQ2d 1222 (Fed. Cir.), cert. denied, 488 U.S. 956 (1988).

The Examiner further notes that evidence pertaining to secondary considerations must be taken into account whenever present; however, it does not necessarily control the obviousness conclusion. See, e.g., *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1372, 82 USPQ2d 1321, 1339 (Fed. Cir. 2007) ("the record establish [ed] such a strong case of obviousness" that allegedly unexpectedly superior results were ultimately insufficient to overcome obviousness conclusion); *Leapfrog Enterprises Inc. v. Fisher-Price Inc.*, 485 F.3d 1157, 1162, 82 USPQ2d 1687, 1692

(Fed. Cir. 2007)("given the strength of the prima facie obviousness showing, the evidence on

secondary considerations was inadequate to overcome a final conclusion" of obviousness); and

*Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 768, 9 USPQ2d 1417, 1426 (Fed. Cir

1988). Office personnel should not evaluate rebuttal evidence for its "knockdown" value against

the prima facie case, *Piasecki,* 745 F.2d at 1473, 223 USPQ at 788, or summarily dismiss it as

not compelling or insufficient. If the evidence is deemed insufficient to rebut the prima facie case

of obviousness, Office personnel should specifically set forth the facts and reasoning that justify

this conclusion.


As stated in the previous Advisory Action, since the record had established a strong cause

of obviousness with respect to the combination of Novak and Motoyama, the Examiner

considered the Patent Owner's submissions under "secondary considerations" but will maintain

the rejection in view of the above obviousness disclosure.

The Patent Owner stated that commercial success (with a strong nexus) is among the

strongest of the secondary considerations and good evidence of commercial success can even

overcome "strong" cases of obviousness. The Patent Owner cited *Simmons Fastener Corp v.

Illinois Tool Works, Inc.*, 739 F.2d 1573 (Fed. Cir. 1984).

During the Interview, held on October 16, the Examiner dismissed the cited case since no

final decision was made with respect to the "secondary considerations". The Examiner noted that

the Federal Circuit case was remanded back to the District Court and the secondary consideration

issues was not further discussed since the parties had settled.

The Patent Owner now refers the Examiner to *In re Piasecki, Alco Standard Corporation v. Tennessee Valley Authority* and *Allen Archery Inc. v. Browning Manufacturing Co.*

However, as per the response regarding the combination of Motoyama and Novak as disclosed above this issue is moot and no further comments will be made. .

## STATEMENT OF REASONS FOR PATENTABILITY AND/OR CONFIRMATION

The following is an examiner's statement of reasons for patentability and/or confirmation of the claims found patentable in this reexamination proceeding:

### *In regards to Chard 4,605,964:*

In the request for reexamination filed on September 29, 2006, the Requester stated that "Chard discloses a message display control unit 48 that "includes a character generator and various control circuitry", that generates a video signal locally. The input to the display control unit 48 is not a video signal, and the display control unit 48 is therefore the "source" of the alternative video signal and is local to the receiver.

According to the Chard declaration (July 28, 2006) the content of the teletext <u>originates</u> from and is dictated by the video signal sent to the television set by Transmitter 37.

Previously, the Examiner stated that the teletext decoding circuitry necessarily included character generators for local generating/synthesizing the teletext messages that are displayed.

The Patent Owner contended that "displaying the selected video signal" makes clear that the recited "selected video signal" that is displayed on the video display necessarily encompasses

Application/Control Number:                                    Page 18
90/007,733; 90/008,243
Art Unit: 3992

the displayable aspects (i.e. content) of that video signal. The Patent Owner states when properly

interpreting the claim, the displayable aspects (or content) of the alternative source of video

signal <u>are required to originate local to the received station</u>, (emphasis added).

The Examiner notes that the Patent Owner's arguments in combination with the

submitted declaration of Frederick W. Chard with respect to '964 Chard Patent that both the

received program and alternative video signal (teletext) <u>originate from the same source</u> is

persuasive and thus Chard '964 does not anticipate or render obvious the claims.

### *In regards to Chard '341,*

In the Request for reexamination, the Requester states Chard discloses provision of a

local alternative video signal such as from a VCR. Specifically Chard discloses video playback

apparatus, video game-playing apparatus, or a data display service (teletext or viewdata) could

be enabled whenever there is no selected transmission being output, (pages 12-13).

In the Office Action mailed on October 1, 2007, the Examiner acknowledged that Chard

'341 indicates that the video signal is simply blanked and more specifically does not teach a step

of displaying a "local" alternative source of video in place of the video signal that is blocked.

The Examiner further acknowledged that Chard '341 suggested that an alternative configuration

was possible in which an alternative video signal source, producing an alternative video signal

source, was enabled whenever no selected transmission was being outputted by the system.

> "Alternatively, video playback apparatus, video game-playing apparatus, or a data
> display service (teletext or viewdata) could be enabled whenever there is no selected
> transmission being output"

Application/Control Number:                                      Page 19
90/007,733; 90/008,243
Art Unit: 3992

The Examiner again notes herein that on pages 12 to 13, Chard '341 discloses of several

alternative embodiments. On page 12, lines 22-page 13, line 3, Chard '341 discloses the

activation of a video recorder coupled to the television set. The video recorder runs for the

duration of a selected transmission and then stopped based on the code word. The Examiner

notes that no further explanation as per this scenarios is further disclosed. The Examiner notes

that this appears to be directed to recording selected transmissions and starting and stopping the

recording based on code words in the transmissions.

On page 13, lines 4-12, Chard '341, as disclosed above, discloses that when time

transmission of a viewdata service is being monitored, selection is effected on the basis of

combination of parameters A1 and A2 and video game-playing apparatus can be controlled in the

same manner as any other channel so as to be usable only at certain times.

Chard '341 finally discloses "video playback- apparatus, video game-playing apparatus,

or a data display service (teletext or videodata) could be enabled whenever there is not selected

transmission being output.

However, as previously acknowledged, while Chard '341 allows for a local output of

video from "video playback apparatus or video game-playing apparatus" Chard '341 does not

disclose that this is enabled i.e. the video playback device or video game-playing apparatus in

response to determining, based on the claimed comparison step, that an alternative "local" video

source is to be displayed.

Thus, Chard '341 does not disclose in response to comparing the received program

classification code with the contents of the memory means, determining that a local video signal

should be selected for display.

Application/Control Number:                                    Page 20
90/007,733; 90/008,243
Art Unit: 3992

### *In regards to Mori -JP 59-120782:*

Mori discloses in one embodiment of a PG code signal being received. If the PG code

signal satisfies the level of the PG code signal stored in the memory it reads and deciphers the

scramble code and then descrambles the image signal. If the PG code level does not satisfy the

level, the microcomputer does not read the scramble code and the specific channel (alternative

channel) is selected so that normal image is projected on the television receiver continuously.

The Patent Owner's response, submitted July 28, 2006, states Mori calls for video

censoring by way of changing television channels. For example, if a user attempts to tune a

television to Channel 2 (and Channel 2 is broadcasting a program deemed unsuitable for

viewing), Mori discloses a system that instead tunes the receiver to a different (more suitable)

channel.

In addition the Patent Owner states Mori does not discloses the "a local alternative source

of video" since Mori discloses a signal source of video signals - the transmitter that transmits a

signal collectively consisting of 60 television channels.

The Examiner agrees that Mori does not disclose selecting a "local alternative source of

video" to be used but instead discloses of selected a remote source (i.e. a different broadcast

channel).

Thus, Mori does not disclose in response to comparing the received program

classification code with the contents of the memory means, determining that a local video signal

should be selected for display.

Application/Control Number:                                Page 21
90/007,733; 90/008,243
Art Unit: 3992

*In regards to Novak US Patent 4,750,213:*

    See the above discussion with respect to Novak and Motoyama.

*In regards to Block US Patent 4,484,217:*

    Block discloses a parental control system in which both tier and category information are stored in memory and compared with received program data. (col. 9, line 60 to col. 10, line 16). The category code is compared to a category code selected by the subscriber through keyboard interface 52 and stored in memory 90. (col. 11, lines 39-44). If the codes do not correspond, a message is displayed on the controller display indicating that the subscriber is not authorized to receive the program. (col. 11, line 59 to col. 12, line 18).

    The Patent Owner has argued that Block discloses a set top box and displays content that is not local. In the Patent Owner's response, filed on July 28, 2006, the Patent Owner states Blocks does not disclose a television receiver; it discloses a set-top-box (a.k.a. a "decoder") that can interface with a television. The Patent Owner contends the "wrong category" message generated by Block is not generated *local* (i.e. internal) to the receiving station as required by claims 3 and 6 of the '160 patent. The 'wrong category" message in Block is not used as a censoring signal as also required by claims 3 and 6. The Patent Owner states that in the claims, the alternative signal is used to replace the primary signal during periods of censorship. In contrast, Block clearly only indicates that the "wrong category" message is displayed on Display 50, which is the display of the set-top-box, not the video screen.

    The Examiner acknowledges that the Block declaration, filed on July 28, 2006, states that his '217 patent discloses that the "wrong category" message generated by the '217 patent is not a

Application/Control Number:                                    Page 22
90/007,733; 90/008,243
Art Unit: 3992

video signal, but is a text message displayed on a Display 50, which is the display on the set-top

box, not on the television set. Mr. Block also noted that "wrong category" signal is not a signal

used to censor a program.


        Thus, the Examiner notes that Block does not disclose in response to comparing the

received program classification code with the contents of the memory means, determining that a

local video signal should be selected for display and displaying the selected video signal on a

video display means.


### In regards to Inagaki US Patent 4,896,354:

        In the request for reexamination filed on September 29, 2006, the Requester contends

Chard and Inagaki both disclose parental control systems that block a program and display a

message from an alternative source - a local character generator. Inagaki describes a system in

which the information for the message generated by the character generator is transmitted. The

Request also contends that Inagaki also specifically discloses that the message to be displayed

can instead be prepared at the receiving side, (col. 6, lines 4-44). In addition, Inagaki discloses

that in the channel blocking mode, a locally stored and generated message "BLOCKED" is

displayed when the television receiver is tuned to a blocked channel.

        The Patent Owner argued in their response filed on December 3, 2007 that in Inagaki, the

source of the alternative video signal is remote from the receiving stations. The Patent Owner

notes that "Blocked By Center" message is "transmitted form the transmitted side", which clearly

is not local to the receiver or alternate to the received video signal.

Application/Control Number:                                    Page 23
90/007,733; 90/008,243
Art Unit: 3992

The Examiner agrees with the Patent Owner that Inagaki does not disclose displaying a
local alternative video based on the claimed comparison step.

Thus, the Examiner notes that Inagaki does not disclose in response to comparing the
received program classification code with the contents of the memory means, determining that a
local video signal should be selected for display.

***In regards to Benjamin US Patent 4,768,229***

Benjamin discloses a restrictive access system for parental control in which a local
microprocessor control. 18 is employed to generate a video signal containing a message at the
receiver based on information available at the receiver when a program is blocked based upon a
comparison between a television receiver tuned to a restricted channel and a memory that
contains a list of channels to be blocked.

The Examiner notes that Benjamin limits tuning to only designated channels to provide a
parental control function. The Examiner further notes that the claim requires "receiving a video
signal...", "receiving a program classification code descriptive of said video signal." The
Examiner notes that while Benjamin outputs a message, this message is based on block channels
and not based on any received video signals or program classification codes that is descriptive of
the video signal. Benjamin relates to only allowing or denying access to channels and is not
concerned with any program codes.

Application/Control Number:                                Page 24
90/007,733; 90/008,243
Art Unit: 3992

Thus, the Examiner notes that Benjamin does not disclose "receiving a video signal…",

"receiving a program classification code descriptive of said video signal" and in response to

comparing the received program classification code with the contents of the memory means,

determining that a local video signal should be selected for display.


### In regards to Skerlos US Patent 4,633,297

Skerlos discloses a television system having a teletext decoder that is also used to

generate a video signal for on-screen display message pre-stored locally in a page ROM 56 in the

television receiver.

The Examiner notes that in Skerlos discloses a teletext processor with ROM for on-

screen messages. While it is clear that Skerlos is not directed to censoring any program or the

comparison of program codes, Skerlos discloses that it was well known in the art to store on-

screen messages locally. The Examiner however, notes that Skerlos was proposed to be used

with at least Chard. Chard specifically discloses that the teletext information is sourced from the

broadcaster. This information is imperative to the functionality of Chard since it is the

broadcaster who determines the programming codes. While local character generators for tele-

text are used in both Chard and Skerlos, the information that is used for the character generators

were derived from a remote source. In addition, there is no suggestion that the "on-screen"

messages of Skerlos would provide a local alternative source that would be usable with the

censoring system of Chard since the broadcaster has to submit the teletext information.

Application/Control Number:
90/007,733; 90/008,243
Art Unit: 3992

Page 25

***In regards to Campbell US Patent 4,536,791:***

Campbell discloses a parental control system that includes a text/graphics generator 118 that is used both for viewing of teletext and for display of messages relating to program blocking as shown in Fig. 12 at 326 and 334. Access codes are stored in memory and compared with transmitted codes. A message is displayed to indicate when a program is blocked. The text/graphics generator 118 is local to the television receiver (see "TO TV" at 134 in Fig. 6). Moreover, one of ordinary skill in the art would have recognized the content of the displayed messages are originated locally, because the system described is a one-way system (see col. 11, line 27 to col. 16, line 14) and the head end would not know what messages to transmit for display in response to various user selections.

The Examiner notes Campbell like Chard discloses receiving teletext data. This data is originally broadcast from a remote source. While text/character/graphics generators are local, the information the generators use are from a remote source and not from a local source. Thus, not local alternative video is displayed on the receiver means.

***In regards to Elam US Patent 4,554,584:***

Elam discloses an auxiliary circuit for blanking (audio and video) by digital code words transmitted as part of the video signal. The circuit detects and decodes the transmitted code and depending upon the code received, blanks either or both the audio and video signal in the receiver. Elam uses the ASCII codes used to specify the movie rating (G, PG and R) for program material and having the television receiver blank the picture and sound whenever the rating level, based upon the code received, exceeds that selected by the viewer.

Application/Control Number:                                    Page 26
90/007,733; 90/008,243
Art Unit: 3992

The Examiner notes that Elam discloses a "blanking interface" with the television

receiver circuits which perform the video and audio blanking function. Elam notes video

blanking was accomplished by simultaneously grounding the voltages form both the brightness

control and the contrast control potentiometers.

The Examiner notes that Elam discloses of generating a blanking signal for subsequent

audio or video blanking relays. As stated above, Elam discloses video blanking was

accomplished by simultaneously grounding the voltages from both the brightness control and the

contrast control potentiometers.

Thus, in view of this embodiment no "alternative source of video" is displayed since

nothing is displayed, i.e. no video. The Examiner notes that the claims positively recites a video

source to be selected for display.

Additionally, the Examiner notes for an alternative embodiment, the Requester

acknowledges that although in Elam the received rating is also displayed even when the program

is not blocked, it would certainly be obvious to provide the display only when blocking is done

since that is when it is most desirable to provide information to the viewer to explain why the

program cannot be viewed.

Thus, the Requester acknowledges that Elam does not provide an alternative source of

video to be displayed in response to the claimed comparing step. The claims specifically require

selecting an alternative local source. The circuitry of Elam blanks the screen and thus does not

select or cause to be selected an alternative local video source since no video is displayed. The

blanking or no displaying of video is not considered a video source since no video is positively

Application/Control Number:                          Page 27
90/007,733; 90/008,243
Art Unit: 3992

displayed. The Examiner notes that while the Vogel Patent discloses of using a "black signal",

the Vogel Patent discloses that the black signal as being positively <u>generated</u> and hence video is

created using this black signal generator. While the end result of Elam may produce what

appears to be a blank/black screen, there is no positive generation of a black/blank signal for

output but instead the lack of any **positive generation of video for output**.

*In regards to Olivo US Patent 4,888,796:*

Olivo discloses a program material screening device in which a "material content signal"

("MCS") is provided to indicate the nature of a program. The MCS can take a wide variety of

forms, including tones, a radio signal simulcast, or a telecast independent of transmission of the

program signal.

The Olivo Patent further discloses a screening device (8A) detects the simulcast R

content signal (3) and <u>prevents the television set (7A) from replaying the movie (1A) from the</u>

<u>broadcast signal (1).</u> Thus, while Olivo prevents the displaying of objectionable content by the

television set, Olivo does not disclose of selecting for output an alternative local video source for

display during the preventing step.

Any comments considered necessary by PATENT OWNER regarding the above

statement must be submitted promptly to avoid processing delays. Such submission by the

patent owner should be labeled: "Comments on Statement of Reasons for Patentability and/or

Confirmation" and will be placed in the reexamination file.

Application/Control Number:                                    Page 28
90/007,733; 90/008,243
Art Unit: 3992

### *Conclusion*

### NOTICE RE PATENT OWNER'S CORRESPONDENCE ADDRESS
Effective May 16, 2007, 37 CFR 1.33(c) has been revised to provide that:

The patent owner's correspondence address for all communications in an *ex parte* reexamination or an *inter partes* reexamination is designated as the correspondence address of the patent.

> *Revisions and Technical Corrections Affecting Requirements for Ex Parte and*
> *Inter Partes Reexamination*, 72 FR 18892 (April 16, 2007)(Final Rule)

**The correspondence address for any pending reexamination proceeding not having the same correspondence address as that of the patent is, by way of this revision to 37 CFR 1.33(c), <u>automatically changed to that of the patent file</u> as of the effective date.**

This change is effective for any reexamination proceeding which is pending before the Office as of May 16, 2007, <u>including the present reexamination proceeding</u>, and to any reexamination proceeding which is filed after that date.

Parties are to take this change into account when filing papers, and direct communications accordingly.

In the event the patent owner's correspondence address listed in the papers (record) for the present proceeding is different from the correspondence address of the patent, it is strongly encouraged that the patent owner affirmatively file a Notification of Change of Correspondence Address in the reexamination proceeding and/or the patent (depending on which address patent owner desires), to conform the address of the proceeding with that of the patent and to clarify the record as to which address should be used for correspondence.

Telephone Numbers for reexamination inquiries:
| | |
|---|---|
| Reexamination Practice | (571) 272-7703 |
| Central Reexam Unit (CRU) | (571) 272-7705 |
| Reexamination Facsimile Transmission No. | (571) 273-9900 |

2.    The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a), to

apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving

Patent No. 4,931,160 throughout the course of this reexamination proceeding. See MPEP §§

2207, 2282 and 2286.

Application/Control Number:                                     Page 29
90/007,733; 90/008,243
Art Unit: 3992

3.      Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings

because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a

reexamination proceeding.  Additionally, 35 U.S.C. 305 requires that reexamination proceedings

"will be conducted with special dispatch" (37 CFR 1.550(a)).  Extension of time in *ex parte*

reexamination proceedings are provided for in 37 CFR 1.550(c).

4.      All correspondence relating to this *ex parte* reexamination proceeding should be directed:

By EFS:      registered users may submit via the electronic filing system EFS-Web, at
             https://sportal.uspto.gov/authenticate/authenticateuserlocalepf.html.

By Mail to:  Mail Stop *Ex Parte* Reexam
             Central Reexamination Unit
             Commissioner for Patents
             P.O. Box 1450
             Alexandria, Virginia 22313-1450

By FAX to:   (571) 273-9900
             Central Reexamination Unit

By hand:     Customer Service Window
             Attn: Central Reexamination Unit
             Randolph Building, Lobby Level
             401 Dulany Street
             Alexandria, VA 22314

        For EFS-Web transmissions, 37 CFR 1.8(a)(1)(i) (C) and (ii) states that correspondence
(except for a request for reexamination and a corrected or replacement request for
reexamination) will be considered timely filed if (a) it is transmitted via the Office's electronic
filing system in accordance with 37 CFR 1.6(a)(4), and (b) includes a certificate of transmission
for each piece of correspondence stating the data of transmission, which is prior to the expiration
of the set period of time in the Office action.

Application/Control Number:                                                    Page 30
90/007,733; 90/008,243
Art Unit: 3992

Any inquiry by the patent owner concerning this communication or earlier

communications from the Legal Advisor or Examiner, or as to the status of this proceeding,

should be directed to the Central Reexamination Unit at telephone number (571) 272-7705.

Ovidio Escalante
Primary Examiner
Central Reexamination Unit - Art Unit 3992
(571) 272-7537

Conferee:                                          Conferee:

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge S. James Otero and the assigned discovery Magistrate Judge is Victor B. Kenton.

The case number on all documents filed with the Court should read as follows:

## 2:CV08- 8439 SJO (VBKx)

All discovery related motions should be noticed on the calendar of the Magistrate Judge

==================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] **Western Division**
**312 N. Spring St., Rm. G-8**
**Los Angeles, CA 90012**

[ ] **Southern Division**
**411 West Fourth St., Rm. 1-053**
**Santa Ana, CA 92701-4516**

[ ] **Eastern Division**
**3470 Twelfth St., Rm. 134**
**Riverside, CA 92501**

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)        NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| GUARDIAN MEDIA TECHNOLOGIES, LTD | CASE NUMBER |
| | |

PLAINTIFF(S)

v.

COBY ELECTRONICS, CORP., ETAL

**CV08-08439** ṠṠ

**SUMMONS**

DEFENDANT(S).

TO:    DEFENDANT(S): _____

A lawsuit has been filed against you.

Within __20__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, _Edward E. Casto, Jr._____, whose address is _5601 Bridge Street, Suite 300, Fort Worth, Texas 76112_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: __DEC 2 2 2008__

By: _Natalie Chinejaia_
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

*Guardian Media Technologies, Ltd v. Coby Electronics Corp., et al.*

IX. Venue (b)

| Corporation: | State, County |
|---|---|
| Coby Electronics Corporation | New York |
| Acer America Corporation | California, Santa Clara County |
| Amazon.com, Inc. | Washington |
| Apple Inc. | California, Santa Clara County |
| Bang & Olufsen America, Inc. | Illinois |
| Best Buy Co., Inc. | Minnesota |
| Bose Corporation | Massachusetts |
| Cisco Systems, Inc. | California, Santa Clara County |
| Costco Wholesale Corp. | Washington |
| Dell Inc. | Texas |
| DirecTV, Inc. | California, Los Angeles County |
| DirecTV Holdings, L.L.C. | California, Los Angeles County |
| EchoStar Corporation | Colorado |
| EchoStar Technologies, L.L.C. | Colorado |
| Fujitsu General America, Inc. | New Jersey |
| Imation Corp. | Minnesota |
| Lenovo (United States) Inc. | North Carolina |
| Lite-On Americas, Inc. | California, Yolo County |
| Lite-On Sales & Distribution, Inc. | California, Yolo County |
| Memorex Products, Inc. | California, Los Angeles County |
| Microsoft Corporation | Washington |
| Motorola, Inc. | Illinois |
| Nintendo of America, Inc. | Washington |
| Onkyo USA Corporation | New Jersey |
| Overstock.com, Inc. | Utah |
| Radio Shack Corporation | Texas |
| Robert Bosch, L.L.C. | Illinois |
| Scientific-Atlanta, Inc. | Georgia |
| Sears, Roebuck and Co. | Illinois |
| Sherwood America, Inc. | California, Los Angeles County |
| Sound Around, Inc. | New York |
| Target Corporation | Minnesota |
| Tivo Inc. | California, Santa Clara County |
| TTE Technology, Inc. | Indiana |
| ViewSonic Corporation | California, Los Angeles County |
| Wal-Mart Stores, Inc. | Arkansas |
| Yamaha Corporation of America | California, Orange County |
| Yamaha Electronics Corporation | California, Orange County |